592 A.2d 1337

Ryan CROSBY, Shane Crosby, and Celina Crosby, Minors by Their Parents and Natural Guardians Barbara and Ronald CROSBY, Jr., H/W and Barbara and Ronald Crosby, Jr., H/W in Their Own Right, Appellants,

v.

Marvin SULTZ, D.O., Appellee.

Superior Court of Pennsylvania.

Argued Oct. 17, 1990.

Filed June 19, 1991.

Murray L. Greenfield, Philadelphia, for appellants.

Thomas W. Smith, Philadelphia, for appellee.

530

Before DEL SOLE, POPOVICH and BROSKY, JJ.

POPOVICH, Judge:

Once again, this Court is confronted with a recurring issue of far-reaching importance, to wit, whether a physician may be held liable for the actions of his patient, which resulted in injury to third party victims. Here, we are not presented squarely with a "duty to warn" situation. Rather, we must decide if a cause of action may be sustained against a doctor where the doctor failed to monitor his patient's conduct. After a comprehensive review of the law in Pennsylvania and other states, as well as consideration of the facts before us, we hold that a doctor has no duty to control his patient's driving habits or to protect third persons from the injuries occasioned by unforeseeable accidents such as the one illustrated below.

This appeal is from an order entered in the Court of Common Pleas of Philadelphia County granting the appellee Dr. Marvin Sultz's preliminary objections and dismissing the appellants Crosbys' complaint with prejudice. The question presented for our review is whether the trial court erred in dismissing the Crosbys' complaint. For the reasons which follow, we affirm.

On May 8, 1988, Barbara Crosby and her children, Ryan, Shane and Celina, were struck by a motor vehicle operated by James Jackson. Mrs. Crosby and her children, all pedestrians at the time, suffered severe injuries as a result of the accident. Seeking recovery for their injuries, Mrs. Crosby, her children and her husband instituted suit against Jackson in July, 1988.[1]

During the course of discovery in the *Crosby v. Jackson* litigation (*see* n. 1, *supra.*), the Crosbys learned that Jackson was a diabetic who had been treated by Dr. Sultz for this condition. The Crosbys assert that Jackson's diabetes caused him to sustain a temporary lapse of consciousness at the wheel of his car and simultaneous loss of control of his vehicle, which resulted in the accident. Based upon this

1. *See Crosby v. Jackson,* No. 1255 PHL CCP 1988.

belief, the Crosbys commenced a separate action against Dr. Sultz on September 14, 1989.

On November 8, 1989, Dr. Sultz filed preliminary objections to the complaint and specifically requested that the action be dismissed because the Crosbys failed to join Jackson as a necessary party.[2] In addition, Dr. Sultz challenged three subparagraphs of the complaint alleging that they were vague and ambiguous.

Before the trial court ruled on these objections, the Crosbys filed an amended complaint on December 6, 1989.[3] (On December 29, 1989, the trial court granted Dr. Sultz's preliminary objections pertaining to the complaint's insufficiently pled subparagraphs and ordered these statements stricken. The trial court added that the order may be rendered moot if the Crosbys had filed an amended complaint which rectified the problems.)

Dr. Sultz filed preliminary objections on January 16, 1990, in response to the amended complaint. In his objections, Dr. Sultz demurred to the amended complaint on the basis that the Crosbys had failed to set forth a cause of action.[4]

**2.** Due to our disposition of this appeal, we need not address this contention.

**3.** In their amended complaint, the Crosbys deleted one of the subparagraphs to which Dr. Sultz had objected and revised the remaining subparagraphs so that they conformed to the specificity requirements referred to by Dr. Sultz.

**4.** The following relevant averments were contained in the Crosbys' amended complaint:

4. At all times relevant hereto, a Mr. James Jackson was under the care of Defendant Dr. Marvin Sultz for treatment of a diabetic condition.

5. As Mr. Jackson's primary treating physician, Defendant Dr. Marvin Sultz was aware of and had complete knowledge of the fact that said James Jackson was suffering from a condition of diabetes which required regular monitoring and insulin treatment.

6. As a licensed physician practicing medicine in the Commonwealth of Pennsylvania, Defendant Dr. Marvin Sultz was aware of and had complete knowledge of the fact that Mr. Jackson's condition was likely to cause temporary loss of consciousness due to sudden changes in blood sugar levels.

7. On or about May 8, 1988, at approximately 12:20 P.M., James Jackson was operating a motor vehicle owned by Defendant Lorraine Jackson at the intersection of Frankford Avenue and Levick

Dr. Sultz further objected to the Crosbys' capacity to bring suit. All of Dr. Sultz's objections were sustained on March 29, 1990. The trial court ordered that the amended com-

Street in Philadelphia, PA. when suddenly and without warning Mr. Jackson struck Plaintiff Barbara Crosby and her three small children, Plaintiffs, Ryan, Shane and Celina Crosby, pedestrians, injuring Plaintiffs as will be set forth more particularly below.

8. On the aforesaid date and time, Mr. James Jackson suffered a temporary loss of consciousness resulting from his diabetic condition, which was the direct and proximate cause of the aforesaid accident. . . .

9. The negligence of the Defendant consisted, *inter alia,* of the following:

a. allowing and permitting Mr. James Jackson to operate a motor vehicle when Defendant knew or should and could have known of the dangerous propensities of Mr. Jackson's condition;

b. failing to exercise reasonable care and judgment in allowing Mr. James Jackson to operate a motor vehicle;

c. failing to conform to the requisite standard of medical care; in that Defendant Dr. Marvin Sultz allowed Mr. Jackson to drive though, Defendant, a licensed physician, had complete knowledge that Mr. Jackson's condition was likely to cause temporary loss of consciousness due to changes in blood sugar level;

d. failure to provide and render proper and reasonable medical care under the circumstances, in that Defendant as, Mr. Jackson's primary treating physician, was aware and had complete knowledge of the fact that Mr. Jackson was suffering from a condition of diabetes which required regular monitoring treatment;

e. failure to diagnose and treat properly the condition of Mr. James Jackson;

f. failure to employ the necessary and proper diagnostic evaluations in order to determine that Mr. Jackson was unable to operate a motor vehicle;

g. failure to utilize the appropriate and requisite laboratory, hospital and consulting facilities;

h. failure to make known to Plaintiff, the general public, and James Jackson, the dangers inherent to Mr. Jackson's condition; [and]

i. failure to properly notify the Commonwealth of Pennsylvania of the severity of Mr. Jackson's condition and the fact that same rendered him unable to properly operate a motor vehicle pursuant to 67 Pa.Code § 834, [sic § 83.4] et seq.

Appellants' Amended Complaint, paras. 4–9.

Because these same averments form the basis of the remaining counts of the complaint and are set forth in subsequent paragraphs in substantially similar form, *see* Appellants' Amended Complaint, *i.e.* paras. 17(a)–17(c), it is unnecessary to reiterate these additional allegations. We hasten to add, however, that Mr. Crosby's claim against Dr. Sultz was instituted as one in *consortium* for loss of companionship with his injured wife. *See* Appellants' Amended Complaint, at para. 14.

plaint be dismissed with prejudice. The Crosbys subsequently filed this timely appeal.

Our standard of review is well established. In considering the trial court's grant of a demurrer

we must accept as true all the well-pleaded material facts set forth in the complaint and all reasonable inferences deducible from those facts. Accepting these facts and inferences, we then determine whether the pleader has failed to state a claim for which relief may be granted, and we will affirm the grant of a demurrer only if there is certainty that no recovery is possible. All doubts are resolved in favor of the pleader. Furthermore, by filing preliminary objections in the nature of a demurrer, appellees have admitted the factual allegations of the complaint for purposes of the demurrer.

*Ward v. Serfas*, 387 Pa.Super. 425, 428–29, 564 A.2d 251, 252–53 (1989) (citations omitted). *See also Gordon v. Lancaster Osteopathic Hospital Ass'n, Inc.*, 340 Pa.Super. 253, 260, 489 A.2d 1364, 1368 (1985); *DeAngelo v. Fortney*, 357 Pa.Super. 127, 515 A.2d 594 (1986). In this light, we shall evaluate the Crosbys' appellate claim.

In order to set forth a cause of action in negligence, the Crosbys were required to plead sufficient facts which would establish that: (1) the doctor owed them a duty of care; (2) the doctor breached that duty; (3) they were injured; and (4) the injuries were proximately caused by the doctor's breach of duty. *Ellis v. Sherman*, 512 Pa. 14, 18, 515 A.2d 1327, 1328 (1986). In applying these elements to this case, the trial court concluded that the Crosbys failed to establish that Dr. Sultz owed them any duty. *See* Trial court opinion, May 30, 1990, at 2. *See also Mazzagatti v. Everingham by Everingham*, 512 Pa. 266, 516 A.2d 672 (1986); *Casey v. Geiger*, 346 Pa.Super. 279, 499 A.2d 606 (1985) (discusses elements of negligence); *Cummins v. Firestone Tire and Rubber Co.*, 344 Pa.Super. 9, 495 A.2d 963 (1985) (same); *Macina v. McAdams*, 280 Pa.Super. 115, 421 A.2d 432 (1980) (same). The Crosbys contend that the trial court erred and argue that such a duty was imposed because of

the nature of the relationship between Dr. Sultz and his patient Jackson. Thus, the inquiry which we must resolve first is whether Pennsylvania law imposes a duty on physicians to protect third parties from harm which could be inflicted on such persons by the physicians' patients.

Certain provisions of the Vehicle Code, 75 Pa.C.S.A. §§ 101–9701, are crucial to our discussion of this case. Thus, before we embark on our analysis, we note the following. Section 1517 of Title 75 provides for the creation of a Medical Advisory Board, which is to be comprised of a variety of medical, law enforcement and governmental officials.[5] In addition, this provision directs the Medical Advisory Board to develop rules and regulations pertaining to the physical and mental criteria for the licensing of drivers, which are to be reviewed and adopted by the Pennsylvania Department of Transportation. *See* 75 Pa.C.S.A. § 1517(b) and 67 Pa.Code § 83.1 (1990). Specifically, the Medical Advisory Board must define disorders involving lapses of consciousness or other mental or physical disabilities which would affect the ability of a person to drive safely. *See* 75 Pa.C.S.A. § 1518(a). In fulfillment of these statutory duties, the requisite physical and mental criteria have been promulgated in the Pennsylvania Code as follows:

(a) *General.* A person afflicted by any of the following conditions may not drive if, in the opinion of the examining physician, the conditions are likely to interfere with the ability to control and safely operate a motor vehicle:

(1) Loss or impairment of the use of a foot, leg, finger, thumb, hand or arm, as a functional defect or limitation.

(2) Unstable or brittle diabetes or hypoglycemia, unless there has been a continuous period of at least 6 months freedom from a related syncopal attack.

(3) Cerebral vascular insufficiency or cardiovascular disease, including hypertension, with accompanying signs and symptoms.

5. This provision was repealed to the extent that the Attorney General has been made a member of the Medical Advisory Board. *See* Act of 1980, October 15, P.L. 950, No. 164, § 505, 71 P.S. § 732–505.

(4) Periodic loss of consciousness, attention or awareness from whatever cause.

(5) Rheumatic, arthritic, orthopedic, muscular or neuromuscular disease.

(6) Mental deficiency or marked mental retardation in accordance with the International Classification of Diseases. For diagnostic categories, terminology and concepts to be used in classification, the physician should refer to the *Diagnostic and Statistical Manual* of the American Psychiatric Association and the *Manual on Terminology and Classification in Mental Retardation* of the American Association on Mental Deficiency.

(7) Mental or emotional disorder, whether organic or functional.

(8) Use of any drug or substance, including alcohol, known to impair skill or functions, regardless [of] whether the drug or substance is medically prescribed.

(9) Another condition which, in the opinion of the examining licensed physician, could interfere with the ability to control and safely operate a motor vehicle.

67 Pa.Code § 83.5 (1986).[6]

Where a person is diagnosed as having one or more of the above disorders, the physician or other health professional who is responsible for treating the patient must utilize these criteria and render an opinion as to whether the disorder affects the patient's ability to drive safely. *See* 67 Pa.Code § 83.5 (1986), *supra.*, and 67 Pa.Code § 83.1 (1990). If the physician or other health professional determines that the disease impinges upon the patient's driving abilities, then the physician must report the patient's name, address and date of birth to the Department of Transportation. *See* 75 Pa.C.S.A. § 1518(b).

Neither of the parties has referred us to any cases which interpret the above provisions, nor has our own research

---

**6.** *See* 67 Pa.Code § 83.4 (1986) for a description of the criteria relating to epilepsy.

uncovered any such authority.[7] However, we note that the appellate courts have recently addressed similar questions in *DiMarco v. Lynch Homes—Chester County, Inc.*, 525 Pa. 558, 583 A.2d 422 (1990), and *Dunkle v. Food Service East, Inc.*, 400 Pa.Super. 58, 582 A.2d 1342 (1990). Because of the dearth of authority on this subject, it is necessary that we review these decisions.[8]

7. The relevant provisions of the Pennsylvania Motor Vehicle Code have been scarcely interpreted. *But see Klotz v. Commonwealth*, 77 Pa.Commw. 134, 465 A.2d 113 (1983) (discusses the Department of Transportation's Regulations, 67 Pa.Code §§ 83.1–83.5). *See also McKay v. Commonwealth*, 52 Pa.Commw. 24, 415 A.2d 910 (1980).

8. Although the issue discussed therein is not directly on point with the instant case, we find *Commonwealth, Dep't of Transportation v. Tinsley*, 128 Pa.Commw. 594, 564 A.2d 286 (1989) to be instructive. In *Tinsley*, a school bus driver appealed an order of the Department of Transportation revoking her license because she was diabetic. For reasons not pertinent to the instant situation, the Commonwealth Court found that revocation was improper. However, in holding in her favor, the Commonwealth Court advanced the following argument.

> The essential nature of the school bus licensing program is to prevent any and all appreciable risks that would prevent a school bus driver from controlling the students and safely operating the bus. [Citation omitted]. DOT contends that diabetics are an appreciable risk because a deviation from a daily routine of medication could result in an impairment of the bus driver's ability to provide for the safety of the passengers. DOT's speculation about the possible effects of diabetes is not appropriate. The proper inquiry must be directed to Tinsley herself and the effects of *her* handicap upon *her* job performance. [Citation omitted].
>
> In the case at bar, it is undisputed that Tinsley's blood sugar level has been under control since shortly after she was diagnosed a diabetic in December 1985. Dr. Diwan testified that Tinsley's blood sugar level could be accurately tested, by a blood prick test, to determine whether her diabetes is under control. The test can be performed and the results obtained in approximately 30 seconds. We can not agree that accommodation of Tinsley would either alter the essential nature of the program or be an undue burden on DOT. As previously noted, Tinsley's diabetes has been under control since her release from the hospital. Furthermore, the District has indicated that it would be willing to administer the blood prick test to ensure that Tinsley's diabetic condition remains under control and to suspend her if her condition is not under control. [....] Although DOT would not have direct daily control over the tests, it does not ordinarily have direct contact with any licensee, e.g. DOT does not check everyday to see if those who are required to wear corrective lenses are wearing them.

In *DiMarco*, the plaintiff maintained sexual relations with a woman who was employed as a blood technician. While she was withdrawing blood from a patient, she was accidentally punctured by a needle which had been used on the patient. The woman was later informed that the patient was a carrier of hepatitis and other diseases. As a result, she immediately sought treatment from her physicians who advised her to abstain from sexual relations for a period of six weeks. Although the woman followed this advice and abstained from sexual intercourse for a period of eight weeks, she and her partner, the plaintiff, subsequently contracted hepatitis. DiMarco then brought suit against the woman's physicians asserting that they were negligent in failing to warn her that hepatitis could be sexually transmitted to her partner for a period of six months after her exposure to the disease. The physicians filed preliminary objections in the nature of a demurrer which were sustained by the trial court. On appeal, this Court reversed and held that the physicians owed a duty to advise the patient reasonably of her ability to transmit the disease. Additionally, we stated that where a third party had actually relied upon the physicians' advice, the duty should be extended to that third party. In affirming the decision of this Court, the Pennsylvania Supreme Court expressly extended the physicians' duty to encompass third-parties whose health would be threatened by contact with a patient who is a carrier for a communicable disease. *See DiMarco*, 525 Pa. at 562–64, 583 A.2d at 425.

A panel of this Court reached a contrary result in *Dunkle, supra*. In *Dunkle*, the plaintiff's decedent resided with a patient who was diagnosed as having a schizophreniform disorder for which his doctor had prescribed medication. The patient stopped taking the medication upon the advice of his psychiatrist, after which he became "nasty" and "violent." As a result, the psychiatrist represcribed the drug.

*Id.*, 128 Pa.Commw. at 597–99, 564 A.2d at 288. *See also Commonwealth, Dep't of Transportation v. Chalfant*, 129 Pa.Commw. 430, 565 A.2d 1252 (1989).

Later, the psychiatrist discontinued the patient's use of the drug, but directed him to ingest the medication on an "as needed" basis. Following his discharge from the psychiatrist's care, the patient strangled his girl-friend, who died one week after the attack. The administrator of the victim's estate instituted suit against the patient's health care professionals, alleging that these individuals had been negligent in failing to warn or protect the decedent from the patient's hostility. The defendants filed preliminary objections in the nature of a demurrer, but the trial court postponed ruling on the objections until after discovery had been effectuated. The defendants thereafter filed motions for summary judgment which were granted by the trial court. On appeal, this Court affirmed the trial court's decision and declined to extend the psychiatrist's/psychologist's duty of care to third parties. *See Dunkle*, 400 Pa.Super. at 63–64, 582 A.2d at 1345. In reaching this result, we distinguished *DiMarco*,[9] and reasoned that a duty could not be imposed on the treating parties because there was no indication that the patient had threatened to inflict harm on the victim or any other individual. *See Dunkle*, 400 Pa.Super. at 68, 582 A.2d at 1347–48.

A careful analysis of these decisions reveals that in each case, the issue of whether the physicians owed a duty to the third persons turned upon the question of foreseeability. In essence, the question asked and addressed by the appellate courts was whether it was reasonably foreseeable that third persons would be harmed by the conduct of the physicians. In *DiMarco*, the Supreme Court answered this

**9.** The Supreme Court's affirmance in *DiMarco* was still pending at the time this Court decided the *Dunkle* case. Although *DiMarco* was *actually* filed a few days before this Court's decision in *Dunkle*, we did not, at the time of that writing, have the benefit of the supreme court's reasoning. However, it is most unlikely that a different result would have been reached in *Dunkle* due to the factual dissimilarities between the two cases. In fact, the Pennsylvania Supreme Court's evaluation and ultimate decision in *DiMarco* far extended the narrow holding that this Court explicitly intended when it decided the case originally. *See DiMarco v. Lynch Homes—Chester County, Inc.*, 384 Pa.Super. 463, 473, 559 A.2d 530, 535 (1989). *See id.* at n. 3. *See DiMarco*, 525 Pa. 558, 560–64, 583 A.2d 422, 424–25 (1990).

in the affirmative and observed that it was reasonably foreseeable that patients who have been exposed to an infectious and communicable disease will transmit the disease to third parties unless adequate medical advice is given to prevent the spread of the disease. *See DiMarco,* 525 Pa. at 560–64, 583 A.2d at 424–25. In *Dunkle,* however, this court concluded that it was not reasonably foreseeable that a patient suffering from mental illness would inflict harm on a particular individual where the patient had never evidenced an intent or desire to harm that person. *See Dunkle,* 400 Pa.Super. at 64, 582 A.2d at 1345. Having reviewed these decisions, we must now apply their principles to the facts of this case.

We find that the instant case is more akin to this Court's decision in *Dunkle* than to the supreme court's holding in *DiMarco.* At the onset, we note that the supreme court in *DiMarco* recognized statutory authority in support of the proposition that physicians are required to report individuals suspected of having a communicable disease to the local and state boards of health. *See* the Disease Prevention and Control Law of 1955, 35 P.S. § 521.4. *See* 28 Pa.Code. § 27.21 (1989). *See DiMarco,* 525 Pa. at 562–64, 583 A.2d at 425. Comparatively, under the facts of this case, Dr. Sultz was not required by statute to report Jackson's health problem to anyone.

In enacting the Motor Vehicle Code, one of the overriding goals of the legislature was to promote and facilitate the safety of the public highways. In furthering this purpose, the legislature considered that there are certain medical disorders which by their nature have a discernible impact upon an individual's ability to drive safely. *See* 75 Pa. C.S.A. §§ 1517–1518; 67 Pa.Code §§ 83.1–83.3 (1990); §§ 83.4–83.5 (1986). Thus, the legislature has imposed upon physicians who diagnose and treat such disorders the duty of notifying the Department of Transportation of the existence of individuals who suffer from these specific conditions and who, in the opinion of the physician, are thereby rendered unable to drive in a safe manner.

However, it is not the physicians' job to protect all third parties who might come into contact with the affected individual. Clearly, the provisions implicated here do not mention a duty to report the patient's medical deficiency to any specified third party. Rather, the physicians' only responsibility is to evaluate (within the confines of the legislative language) the patient's ability to operate a motor vehicle and to notify *the Department of Transportation* if the patient is unable to drive in a safe manner. Reporting the patient to the proper authorities when necessary is very different from imposing upon a treating physician the duty of protecting the entire public from any harm that might result from his/her patient's actions.

We have reproduced 67 Pa.Code § 83.5, *infra.* For the sake of argument, the only sections that even are remotely applicable to the instant circumstances are 67 Pa.Code § 83.5(a)(2), (a)(4) and (a)(9). Section (a) is worthy of reiteration, in that it clearly provides:

A person afflicted by any of the following conditions may not drive, *if, in the opinion of the examining physician,* the conditions are *likely* to interfere with the ability to control and safely operate a motor vehicle.

*Id.* (emphasis added). The condition enumerated in subsection (2) is *unstable* or *brittle* diabetes, *unless* there has been a continuous period of at least six months freedom from a related syncopal attack. (Emphasis added). Here, not only has there been six months of freedom from a loss of consciousness due to Mr. Jackson's diabetic condition, but additionally, there is no allegation that Mr. Jackson has *ever* suffered a loss of consciousness as a result of his affliction. This same analysis applies to subsection (4), which disallows licensing if an individual suffers from periodic losses of consciousness, attention or awareness from whatever cause.[10]

---

10. In this action, the Crosbys did not maintain that Jackson suffered from unstable or brittle diabetes. They did not allege that Jackson sustained a syncopal attack or loss of consciousness within six months of his last visit with Dr. Sultz. *See* 67 Pa.Code § 83.5(2) (1986), *supra.*

■ Subsection (9), the "catch-all" provision, is the only part of 67 Pa.Code § 83.5 that may *actually* apply to this case. Subsection (9) directs that a person may not drive if the examining physician determines "another condition which ... could interfere with the ability to control and safely operate a motor vehicle." Before we discuss the proposed applicability of this subsection to the facts of the instant case, we feel compelled to comment on the effect of a "catch-all" provision.[11]

It appears that the Medical Advisory Board would include a "catch-all" provision to encompass any conditions that it did not already *specifically* enumerate, in order to effectuate the purpose and intent of the Motor Vehicle Code. In interpreting statutes, or in this case, a particular section of the Pennsylvania Code, a court should not assign a contrived meaning to clear language, nor should it construe the statute or provision in question so as to promote or further

Also, the Crosbys did not assert that Jackson suffered from a periodic loss of consciousness. *See* Pa.Code 83.5(4) (1986), *supra*. The Crosbys simply state that Jackson's condition *was likely to* result in a temporary loss of consciousness; however, §§ 83.5(2) and 83.5(4) clearly require that the patient have experienced a prior loss of consciousness rather than a mere possibility that such an event may occur in the future. For these reasons, neither subsection is applicable to this case.

Moreover, the amended complaint is devoid of indication that Dr. Sultz had any reason to believe, other than the plain fact that Jackson is diabetic, that Jackson would lose consciousness at the wheel of his car. Thus, the Crosbys' statement that Jackson's condition "was likely to cause a temporary loss of consciousness" is a conclusion which lacks factual support. In fact, the Crosbys note no circumstances under which it is probable that a diabetic will lose consciousness.

11. Sections 1517 and 1518 of the Pennsylvania Motor Vehicle Code, 75 Pa.C.S.A. §§ 101–9701, are the controlling statutes. It must be assumed that in directing the Medical Advisory Board to formulate criteria for the licensing of drivers in Pennsylvania, the legislature hoped to achieve a goal of safety on our highways. Under the Statutory Construction Act, this Court is bound to consider the object sought to be attained by the legislature in enacting a particular statute. *Commonwealth v. Hess*, 270 Pa.Super. 501, 411 A.2d 830 (1979). Thus, in analyzing the appropriate provisions of the Pennsylvania Code, we will take into account the rules of statutory construction in an attempt to effectuate the intent of the legislature in promulgating the Vehicle Code. *See* 1 Pa.C.S.A. §§ 1901–1939."

absurd results. *See* 1 Pa.C.S.A. § 1921, *et. seq. See also Zimmerman v. O'Bannon*, 497 Pa. 551, 554–57, 442 A.2d 674, 676–77 (1982) ("It is the duty of this Court to ascertain the intention of the General Assembly; that every statute shall be construed, if possible, to give effect to all of its provisions; that where the words of the statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit; and that the General Assembly does not intend a result that is absurd or unreasonable." [citations omitted] ); *Petition for Division into Wards of Scott Twp.*, 388 Pa. 539, 130 A.2d 695 (1957) (where a statute specifically designates certain provisions, all omissions should be understood as exclusions); *Patton v. Republic Steel Corp.*, 342 Pa.Super. 101, 108–10, 492 A.2d 411, 415 (1985) (accord). *See In re Private Det. License of Keibler Det. Agency, Inc.*, 279 Pa.Super. 276, 420 A.2d 1331 (1980) (courts are without power to create additional authority in a statute if the words are clear and unambiguous); *Commonwealth v. Duncan*, 279 Pa.Super. 395, 421 A.2d 257 (1980).

█ With these rules in mind, it would seem that since the Medical Advisory Board *specifically* mentioned certain types of diabetes in the Pennsylvania Code as standards which might preclude licensing,[12] the "catch-all" provision, to include yet another form of the disease, would be redundant. In addition, to structure our own interpretation of subsection (9) to include a diabetic condition that is not shown to be "unstable" or "brittle" or subject to attacks, would be to ignore the clear directives of subsection (2). *See Commonwealth v. Edwards*, 384 Pa.Super. 454, 559 A.2d 63 (1989) (language must be construed according to common and approved usage when interpreting a statute); *Patton v. Republic Steel Corp.*, 342 Pa.Super. 101, 492 A.2d 411 (1985) (legislative intent is the touchstone in statutory interpretation); *Causer v. Mandarino*, 338 Pa.Super. 564, 488 A.2d 36 (1985) (a court must look at the totality of the statute in discerning legislative intent). It would only

12. *See* 67 Pa.Code § 83.5(a)(2) (1986).

make sense, therefore, that without reason to believe that Jackson suffered from one of the conditions enumerated in 67 Pa.Code § 83.5, Dr. Sultz certainly had no duty to report his patient's diabetes to the Department of Transportation.[13]

■ Even if Dr. Sultz *did* have a duty to disclose Jackson's name to the Department of Transportation, we can find no logical connection between that obligation and a duty of care to the Crosbys. The Crosbys were *not* foreseeable victims of *Dr. Sultz's* actions or inactions. *See Zanine v. Gallagher,* 345 Pa.Super. 119, 497 A.2d 1332 (1985) (scope of duty is limited to those risks that are reasonably foreseeable by the actor under the circumstances); *Alumni Ass'n, Delta Zeta Zeta of Lambda Chi Alpha Fraternity v. Sullivan,* 369 Pa.Super. 596, 535 A.2d 1095 (1987) (accord), *aff'd,* 524 Pa. 356, 572 A.2d 1209 (1990). *See also Doyle v. South Pittsburgh Water Co.,* 414 Pa. 199, 207, 199 A.2d 875, 878 (1964) (duty extends to those "falling within the foreseeable orbit of risk of harm."). To discount the important element of foreseeability here is effectively to overrule well-established and precedential tort law, as well as to extend liability limitlessly to treating physicians vis-a-vis third party victims.

Furthermore, we fail to see how Dr. Sultz's conduct in any way jeopardized the lives of the Crosbys. Without engaging in a lengthy discussion of proximate cause or legal causation,[14] suffice it to say that Jackson did not evidence any propensity towards, much less any pattern of, falling ill behind the wheel of a car. We would decline to impose upon the treating physician the burden of not only determining the possibility that a patient's diabetes may

13. For the sake of clarity and continuity, we again note that it would be an absurd result to hold Dr. Sultz liable for resultant injuries to third parties due to Jackson's condition. At most, and at best, Dr. Sultz should be made to answer to the Department of Transportation for his failure to report Jackson's diabetes. Even under this analysis, however, we would be reluctant to impose a duty on the doctor where it is unclear that he had reason to believe that Jackson's ability to drive was impaired by virtue of his illness.

14. *See Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978).

flare up and act as the causal link to a subsequent accident, but in addition, reporting the illness in light of the physician's "diagnosis" and prognosis so as to avoid liability *if* the injured victim sues. This responsibility defies logic and is unworkable. *See Commonwealth v. Stewart,* 375 Pa.Super. 585, 544 A.2d 1384 (1988) (courts are permitted to consider practical consequences of particular statutory interpretations). *See also Hasenei v. United States,* 541 F.Supp. 999 (D. Md.1982) (addresses an issue similar to the one before this Court and holds in favor of the defendant).

We note here that diabetes is not a communicable disease, such as hepatitis. *See DiMarco, supra.*[15] Thus, we refrain from likening the instant circumstances to those in *DiMarco.*

While we fully appreciate the policy concerns underlying the enactment of the Motor Vehicle Code, we cannot condone, under the guise of promoting public policy, sustaining a cause of action against Dr. Sultz. To do so would not be to promote and facilitate the safety of the public highways. It would be to hold a doctor strictly liable for the conduct of

**15.** Were we to compare this situation to that presented in *DiMarco,* we would be creating law which in effect would hold a physician strictly liable for his patient's health problems where there is *any* potential that the patient will become ill behind the wheel of a car and injure an innocent bystander. The doctor's liability under this scenario would not stop at the patient, but rather would extend to any third party who happened to be in the wrong place at the wrong time. To analogize this case to even a very liberal interpretation of the *DiMarco* decision is to encourage boundless liability on physicians who, for centuries, have practiced without fear of the types and varieties of repercussions that the Crosbys' proposed law would yield. At least in *DiMarco,* the *patient* was *misadvised* regarding her ability to transmit a *communicable disease.* The third party victim, who *actually relied* on the misadvice to the patient, was permitted to advance a cause of action against the doctor.

The illness in *DiMarco* was active and threatening; it was a communicable disease capable of transmission to members of the public if left untreated. The effects of mistreatment became apparent where a proper remedy was not pursued. Here, as far as we can tell after reading the pleadings, there was no immediate health threat to Mr. Jackson, let alone to the public at large. Diabetes is a noncontagious disease. We find the facts here to be much more covert than those in *DiMarco* and we hesitate to subject that decision to misinterpretation and abuse.

his/her patients under supreme court precedent whose applicability to this case is tenuous at best.

Moreover, a doctor's first responsibility is to his/her own patient, not to all third parties. It is true that the Pennsylvania Supreme Court's stated purpose in deciding *DiMarco* was to protect third persons who were injured by a doctor's misadvice to his/her patient. *See DiMarco*, 525 Pa. at 560–64, 583 A.2d at 424–25. However, even in *DiMarco*, the doctor's first and foremost responsibility was to his patient. If the doctor had given *proper* advice to Ms. Viscichini in the *DiMarco* case, and the third party victim became ill nevertheless, would the physician still have had a duty to that third party victim? We cannot conceive that the Pennsylvania Supreme Court envisioned this type of resolution when it decided *DiMarco*.

In addition, here, there is no evidence or allegation that Dr. Sultz did not evaluate Mr. Jackson's ability to drive safely *in connection with* his particular "handicap" or "disorder." Rather, the *facts* indicate only that Mr. Jackson's illness was monitored and treated with insulin. The Crosbys' *conclusory statements* indicate that Dr. Sultz *knew* that Mr. Jackson's condition was *likely to cause* loss of consciousness. Significantly, there is *nothing* in the pleadings which set forth the reasons why Dr. Sultz should have concluded that Mr. Jackson's diabetes made him dangerous to third persons. Absent any allegations in the pleadings to satisfy us that Dr. Sultz may have been in any way at fault for the events which led to this litigation, we must sustain the trial court's grant of Dr. Sultz's demurrer.

Here, the *legislature's* goal of ensuring and promoting safe highways by monitoring the driving abilities of the sick and infirm is merely tangential to a *doctor's* duty to diagnose and treat his/her patient properly. Where, as here, there is no evidence whatsoever to suggest that the physician breached his medical duty to his patient or his statutory duty to report his patient's illness where nothing in the patient's history suggested a propensity to faint at the wheel of a car, then we certainly cannot conclude that the

doctor breached a duty to a third party *where no duty existed. See Boyce v. U.S. Steel Corp.*, 446 Pa. 226, 230, 285 A.2d 459, 461 (1971) (there can be no negligence absent a duty of care). The Medical Advisory Board set forth with specificity the kinds of disabilities for which it felt disclosure necessary. It did not require physicians to tailor their patient's illnesses and diseases so as to fit into the categories in an effort to avoid potential liability by third parties.

Finding that the Crosbys did not plead facts in their amended complaint sufficient to set forth a cause of action against Dr. Sultz, we hold that the trial court properly sustained Dr. Sultz's preliminary objections in the form of a demurrer and rightly dismissed the Crosbys' amended complaint with prejudice.

Order affirmed.

DEL SOLE, J., files a concurring opinion.

BROSKY, J., files a concurring statement.

DEL SOLE, Judge, concurring:

While I agree with the result reached by Judge Popovich, I find it necessary to express my views on the issue presented. I do not believe that the ultimate issue we have been asked to decide is as framed by the Majority. We are not being asked whether "a doctor has [a] duty to control his patient's driving habits or to protect third persons from the injuries occasioned by unforeseeable accidents ..." (Opinion p. 1338, 1339) nor are we required to "resolve ... whether Pennsylvania law imposes a duty on physicians to protect third parties from harm which could be inflicted on such persons by the physician's patients." (opinion p. 1340) Clearly, a doctor has no duty to control a patient's driving habits. Further, the appellate courts of this Commonwealth have established that in certain instances a physician has a duty to third parties which can result in liability if breached. *DiMarco v. Lynch Homes*, 525 Pa. 558, 583 A.2d 422 (1990); *Dunkle v. Fd. Service East Inc.*, 400 Pa.Super. 58, 582 A.2d 1342 (1990). In those cases, our courts have

established the basic parameters of potential liability of health care providers to third party non-patients. That liability rests upon foreseeability and the duty imposed by that foreseeability.

In this case, we have existing a statutory duty imposed upon a physician to report certain medical conditions to the Department of Transportation. The question presented is whether the failure to report a reportable condition subjects the doctor to third party liability when injury occurs as a result of the manifestation of that condition. Like the Majority, I conclude that the answer is no and therefore, I too affirm the trial court.

The issue before us is to determine if a private remedy should be implied. In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) the United States Supreme Court set forth four criteria to be examined in making that determination. It focused on discerning the intent of Congress in enacting the legislation. Three of those factors are germane to a state court setting. They are:

First, is the plaintiff one of the class for whose *especial* benefit the statute was enacted, -that is, does the statute create a ... right in favor of the plaintiff? Second, is there is any indication of a legislative intent, explicit or implicit, to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such remedy for the plaintiff?

422 U.S. at 78, 95 S.Ct. at 2008 (citations omitted).

Applying this test, I believe that none of the conditions are met. I begin my analysis by first examining the second prong of the *Cort* test. Clearly, if the legislation contained language expressly granting or denying a private cause of action, the inquiry would end. This statute does neither and, therefor, we must proceed to the application of the remaining criteria to our facts to discern the legislative intent.

I conclude that the legislation does not seek to benefit a particular class of persons but rather is meant to identify

potential impaired drivers so that they may be screened to determine if their operating privileges should be revoked. While it is true that this benefits the public at large, it does not benefit the plaintiff as a member of a particular class for whose protection the statute was passed. Therefore, the first part of the test has not been met.

Also, I conclude that judicial intervention is not consistent with the underlying scheme of the legislation. While it can be argued that the potential of third-party liability would cause doctors to be more inclined to forward reports to PennDot, thereby identifying more impaired drivers, we must keep in mind that it is not the filing of a report that insures the patient will not drive. First, there is no guarantee that if a report is filed, a patient's operating privileges would be revoked. The Department of Transportation could exercise its discretion and not revoke the privileges. In addition, if the department incorrectly failed to revoke Mr. Jackson's drivers license, the plaintiffs would have no cause of action against the Commonwealth. *Giovannitti v. Commonwealth of Pennsylvania, Department of Transportation*, 113 Pa.Cmwlth. 572, 537 A.2d 966 (1988). Also, we must also be mindful of the fact that many people drive while their licence is suspended. Under these circumstances the imposition of liability on the defendant does not further the purposes of the legislation.

Therefore, I am in agreement with Judge Popovich that the failure of a physician to file a report with the Department of Transportation, as required by the act, is not a basis for a private cause of action seeking to impose third-party liability against that doctor.

BROSKY, Judge, concurring.

I agree with the majority that the allegations set forth in appellants' complaint fail to set forth a cause of action. I therefore concur in the result reached by the majority. However, I write separately to express my concerns regarding the implications of the majority's holding.

The report of a patient to the state is undoubtedly a serious matter because the ability to legally operate a motor vehicle is not a luxury in today's society; rather, it is a matter of necessity for most individuals. Because of the importance of maintaining one's driving privileges, physicians may not want to subject their patients to the loss of their driving licenses by reporting their patients to the state. My concern with the majority's holding is that once the incentive of avoiding potential lawsuits from injured third-parties is removed, physicians may no longer feel compelled to comply with their statutory reporting requirements.

The legislature has attempted to promote highway safety and protect members of the public by requiring physicians to report their patients to the appropriate authorities where the patients have particular medical conditions that may affect their ability to safely operate a motor vehicle. Without question, a physician's compliance with the reporting requisites cannot guarantee that the patient's driving license will be revoked by the state or that the patient will not illegally operate his vehicle. However, the physician's compliance will at least further the legislative scheme by putting the state on notice that certain individuals may be unqualified or incompetent to safely operate a motor vehicle. Where a physician fails to report a patient to the state, the legislative scheme is compromised in that it becomes virtually impossible for the state to identify individuals affected by medical conditions which impact on their ability to drive safely. Thus, a physician's compliance with the statute is a necessary and essential component; without such compliance, the system will simply no longer work. The courts should therefore be reluctant to encourage physicians to breach their statutory duties; instead, physicians should be urged to continue to report their patients where the appropriate criteria have been met.