# Walters v. UPMC Presbyterian Shadyside

*William R. Caroselli*, for plaintiffs.

*John C. Conti*, for defendant UPMC Presbyterian Shadyside.

*Paula A. Koczan*, for defendant Maxim Healthcare Services, Inc.

*David P. Helwig*, for defendant Medical Solutions, L.L.C., d/b/a/ Medical Solutions.

WETTICK, *J.*, June 20, 2013—The preliminary objections of UPMC Presbyterian ("UPMC") and Maxim Healthcare Service, Inc. ("Maxim") seeking dismissal of each count within the plaintiffs' first amended complaint are the subject of this opinion and order of court.

In their first amended complaint, plaintiffs allege the following: From March 2008 to May 2008, David Kwiatkowski worked at UPMC Presbyterian Hospital as a radiologic technician. Maxim, an agency that specializes in placing temporary and permanent personnel in healthcare jobs, was Kwiatkowski's employer, and Maxim placed

Kwiatkowski at UPMC.[1]

On May 7, 2008, a UPMC hospital employee observed Kwiatkowski enter an operating room, lift his shirt, put a syringe in his pants, and exit the room. UPMC determined that a syringe containing fentanyl, a Schedule II narcotic, was missing, having been replaced by a syringe containing a different liquid.

UPMC personnel confronted Kwiatkowski, and three empty syringes with fentanyl labels were found on his person. Also, an empty morphine syringe was discovered in his locker, and fentanyl and opiates were present in his urine.

Beginning on or around May 7, 2008, as a result of the above-described incident, UPMC no longer allowed Kwiatkowski to work at UPMC.

Both UPMC and Maxim knew or should have known that Kwiatkowski, without intervention, would continue to engage in the same conduct to satisfy what appeared to be an addiction to controlled substances. They both knew or should have known that the conduct which UPMC observed would be detrimental to the health and wellbeing of patient who come into contact with Kwiatkowski at healthcare facilities. Yet, neither UPMC nor Maxim took steps that would prevent kwiatkowski from working at other healthcare facilities.[2]

---

1. Plaintiffs, pleading in the alternative, also allege that UPMC was Kwiatkowski's employer.

2. I recognize that UPMC and Maxim will be disputing the allegations that they knew Kwiatkowski was likely to harm others in the future and that they took no steps to prevent him from working at other hospitals. However, at the preliminary objection stage of the proceedings, I must assume that the facts are as alleged in the first amended complaint.

After departing from UPMC, Kwiatkowski worked at seven different hospitals between May 2008 and April 30, 2010. Thereafter, on or about May 24, 2010, Kwiatkowski began working at Hays Medical Center in Hays, Kansas. By the time he began his employment at Hays Medical Center he was infected with hepatitis C.

Thomas D. Walters ("plaintiff"), while a patient at Hays Medical Center, was administered medication through a syringe that had previously been diverted, used, infected, refilled, and replaced by Kwiatkowski. Plaintiff tasted positive for hepatitis C on July 31, 2012 and on August 1, 2012. Plaintiff did not know, and could not have known by the exercise of due diligence, of the cause of his disease until the middle of July 2012, at which time Kwiatkowski's behavior was publicly known.

If I read the first amended complaint broadly, it supports a finding that UPMC and Maxim were the only entities with knowledge of Kwiatkowski's addiction and his use of controlled substances until the New Hampshire Department of Health and Human Services announced on July 13, 2012 that more than thirty persons associated with Exeter Hospital Cardiac Catheterization Laboratory (where Kwiatkowski worked after he left Hays Medical Center) had been infected with the same strain of hepatitis C as Mr. Kwiatkowski's strain.

At all relevant times, UPMC was a "registrant" under the Controlled Substance Act (21 U.S.C. §823) because it is licensed to possess, administer, dispense, and distribute controlled substances. A registrant must comply with 21 C.F.R. §1301.76(b) which reads in part as follows:

(b) The registrant shall notify the Field Division Office of the Administration in his area, in writing, of the theft or significant loss of any controlled substances within one business day of discovery of such loss or theft. The registrant shall also complete, and submit to the Field Division Office in his area, DEA Form 106 regarding the loss or theft....

Plaintiffs allege that UPMC never complied with this reporting requirement.

## I. UPMC'S PRELIMINARY OBJECTIONS

The first amended complaint raises three counts against UPMC: count I-common law negligence, count II-negligence per se, and count III-punitive damages. I will initially consider the preliminary objections to count II.

## COUNT II-NEGLIGENCE PER'SE (UPMC)

Plaintiffs base their negligence per se cause of action on UPMC's alleged noncompliance with 21 C.F.R. §1301.76(b) which requires a registrant to provide notice in writing to the Drug Enforcement Administration of the theft or significant loss of any controlled substances within one business day of the discovery of such theft or loss.[3]

If the doctrine of negligence per se applies, the duty and breach of the duty are established by showing that UPMC failed to comply with the notice requirements of 21 C.F.R. §1301.76(b).

---

3. Plaintiffs also base their negligence *per se* count on alleged violations of other regulations imposing a duty on registrants to guard against theft and diversion of controlled substances. However, violations of these regulations did not cause plaintiff's injuries.

The doctrine applies only if a purpose of the statute or regulation is to protect the interests of a group of people, as opposed to the general public Minnich v. Yost, 817 A.2d 538, 541 (Pa. Super. 2003); *Campo v. St. Luke's Hosp.*, 755 A.2d 20, 25 (Pa. Super. 2000).

In *J.E.J v. Tri-County Big Brothers/Big Sisters, Inc.*, 692 A.2d 582 (Pa. Super. 1997), the court states that "in analyzing a claim based on negligence *per se*, the purpose of the statute must be to protect the interest of a group of individuals, as opposed to the general public..." (*Id.* at 585), and ruled that the plaintiffs' "negligence *per se* argument must fail" because J.J. and his parents were in no way affiliated with Tri-County. *Id.* at 586.

No provisions within the Controlled Substances Act or the regulations promulgated thereunder suggest that the scheme created by this legislation and regulations was designed to provide any protections other than to the public at large. Plaintiffs are members of a group of people harmed by the diversion of controlled substances. But there is nothing in the legislation or accompanying regulations suggesting that drug diversion by healthcare employees and its risks to patients are specific subjects that the Controlled Substances Act addressed.

The findings and declarations supporting the enactment of the Controlled Substances Act (21 U.S.C. §801) include the finding that the illegal importation, manufacture, distribution, possession, and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people. The interest to be protected from the regulation's registration

requirement is to protect the public interest in the legitimate use of controlled substances and to inhibit the pernicious consequences to the public's health and safety of illegitimate use. *Bonds v. Tandy*, 457 F.3d 409, 414 (5th Cir. 2009). Congress drafted the CSA to "combat drug abuse and control of legitimate and illegitimate traffic and controlled substances." *Gonzales v. Oregon*, 546 U.S. 243 (2006). Section 21 U.S.C. §823(b) protects the interests of the public in the legitimate use of controlled substances. *Peckens v. Rite Aid of West Virginia, Inc.*, 2011 WL 2938454, *3 (N.D.W.V. 2011) (citing *Bzdzuich v. United States Drug Enforcement Admin.*, 76 F.3d 738, 742 (6th Cir. 1996)).

In summary, plaintiffs cannot recover by showing only that UPMC failed to comply with the notice requirements of 21 C.F.R. §1301.76(b) and that this noncompliance caused the harm described in plaintiffs' first amended complaint because these reporting requirements are intended to protect the interests of the general public.

COUNT I-COMMON LAW NEGLIGENCE (UPMC)

Count I of plaintiffs' first amended complaint is a common law negligence claim against UPMC.[4]

The primary issue raised through the preliminary objections of UMPC is whether UPMC owed a duty of care to a patient, unknown to UPMC, receiving treatment in a hospital in Hays, Kansas, more than two years after Kwiatkowski's departure from UPMC.

---

4. Plaintiffs are not contending that the Controlled Substances Act and its accompanying regulations create a private cause of action. What they do contend is that tort law recognizes a duty owed to the plaintiffs.

Plaintiffs correctly state that the allegations in their first amended complaint will support a finding that UPMC did not exercise reasonable care, and UPMC's conduct created a risk that plaintiff would sustain the harm which he, in fact, sustained Thus, the initial question that I consider is whether under Pennsylvania case law, a showing. in all instances, of a failure to exercise reasonable care and causation is sufficient to plead a cause of action in negligence If the answer is "no" (and it is "no"), the second question is under what circumstances is such a showing sufficient to establish negligence?

These questions, and other questions raised in UPMC's preliminary objections, were considered in the recent opinion of the Pennsylvania Supreme Court in *Seebold v. Prison Health Services, Inc.*, 57 A.3d 1232 (Pa. 2012).[5]

*Seebold* is a negligence action brought by a corrections officer at a state correctional institution. The defendant is Prison Health Services, Inc. ("PHS"), which provided medical services to inmates.

The plaintiff's duties included strip-searching inmates before and after they received visitors. Unbeknownst to the plaintiff, approximately twelve inmates whom the plaintiff strip-searched were infected with MRSA, a

---

5. I reject UPMC's contention that this case is governed by *J.E.J v. Tri-County Big Brothers/Big Sisters, Inc., supra*. In that case, Big Brothers allegedly failed to comply with legislation requiring suspected child abuse to be reported to a law enforcement agency or child protective agency. Subsequently, the person who should have been reported molested another child. The Superior Court dismissed the plaintiffs' complaint against Big Brothers.

*J.E.J.* does not govern the present case because the court's opinion stated that the only harm to be prevented by the statute was to protect children who are in some way connected to the persons who, in the course of their employment, come into contact with abused children.

contagious bacterial infection. As a result of the plaintiff's contact with these inmates, she became infected with MRSA. *Id.* at 1234.

The *Seebold* complaint alleged that PHS's staff knew or should have known that the twelve inmates were infected and owed a duty of reasonable care to the staff and inmates at the correctional institution to warn them of and protect them from acquiring the MRSA infection from those inmates. The complaint describes a fact situation in which the PHS staff failed to detect the infection or to give notice to the plaintiff, and its failure to do so caused the plaintiff's injuries. *Id.*

The common pleas court sustained the defendant's preliminary objections seeking dismissal based on the ground that PHS did not owe a duty to exercise reasonable care to protect the health of a staff member; the PHS owes a duty to exercise reasonable care only to its patients. *Id.*

The Pennsylvania Superior Court reinstated the action[6] It stated that case law imposes a duty upon physicians who treat a patient with a communicable disease to protect the wellbeing of third persons since the patient's health already has been compromised. These third persons consist of specifically identifiable persons most likely to contract a contagious skin disease. This is a narrow class of highly foreseeable plaintiffs and does not support an extension of the duty to the public at large *Id.* at 1236-38.

The Pennsylvania Supreme Court reversed and

---

6. The Superior Court did not issue an opinion. Consequently, I rely on the Supreme Court's description of the Superior Court's memorandum opinion.

remanded for reinstatement of the common pleas court's order on the ground that PHS physicians did not owe a duty of care to the plaintiff.

The court in *Seebold* (with Justice McCafferty dissenting) ruled in favor of the defendant because it did not recognize a general duty that applies across the board to avoid causing physical harm to any and all persons. It, instead, ruled that a defendant may owe a duty of care to warn one category of persons and not another where the defendant has identified a risk of harm to both categories. Liability is limited to the category of persons to whom a duty was owed.

The *Seebold* opinion looked to the case law permitting a negligence claim to be brought against physicians by persons who were not patients of the physicians. The case law, as described in *Seebold*, provided that such claims will be dismissed in the absence of a court-created, new affirmative duty. Furthermore, "in this landscape, the Court has previously adopted the default position that, unless the justifications for and consequences of judicial policymaking are reasonably clear with the balance of factors favorably predominating, we will not impose new affirmative duties." 57 A.3d at 1245.

In determining whether to impose a new affirmative duty, the court stated: "Generally however, there is no duty to protect or rescue someone who is at risk on account of circumstances the defendant had no role in creating." (Citations omitted.) *Id.* at 1246.

The Superior Court appears to have relied primarily on *DiMarco v. Lynch Homes-Chester County, Inc.*, 583 A.2d

422 (Pa. 1990), and *Troxel v. A.I. DuPont Institute*, 675 A.2d 314 (Pa. Super. 1996), in reinstating the action. See the January 25, 2011 order of court of the Pennsylvania Supreme Court granting the petition for allowance of appeal at 13 A.3d 461 (Pa. 2011):

ORDER

PER CURIAM.

And now, this 25th day of January, 2011, the Petition for Allowance of Appeal is granted. The issues, as stated by petitioner, are:

a. Does a physician have a duty to a third party with whom he has no doctor/patient relationship when he negligently diagnoses his patient, an inmate, as not having a contagious disease?

b. Does a physician have a duty to warn third parties who may come into contact with an inmate with a contagious disease that the inmate has a contagious disease to tell the third parties and how to avoid contracting the infectious disease from the linmate?

c. Did the Superior Court impermissibly expand the holding of this court in *DiMorco v. Lynch Homes-Chaster Country, Inc.*, 525 Pa. 558, 588 A.2d 422 (199[0])?

d. Did the Superior Court impermissi-bly expand its own decision in *Troxel v. A.l. DuPont Institute*, 450 Pa. Super. 71, 675 A.2d 814 (Pa. Super. 1996) app'l den. 546 Pa.668, 685 A.2d 547 (1996) to require that a physician warn third parties where previously the Superior Court had limited that duty to only advise a

patient how to avoid spreading the infectious disease that he or she had?

In *DiMarco,* the patient was a blood technician who was exposed to hepatitis B. The defendant-physicians advised her that if she remained symptom-free for six weeks, she could be sure she did not have the disease. Based on that advice, she and her boyfriend refrained from sexual relations for eight weeks and, upon observing that she remained symptom-free, resumed such relations. Thereafter, both the technician and her boyfriend were diagnosed as suffering from hepatitis B. The boyfriend filed suit against the physicians treating his girlfriend claiming they were negligent in failing to warn his girlfriend that she could infect her boyfriend by having relations with him within six months of her exposure. The Pennsylvania Supreme Court in a 4-3 split ruled that the boyfriend had stated a cause of action.

In *Troxel,* the Superior Court allowed a third-party non-patient to bring a negligence action against a medical doctor who failed to advise his patient of the dangers of spreading her disease to the unborn children of others, including the third-party plaintiff.

In *Seebold,* the Pennsylvania Supreme Court ruled that the Superior Court's decision in *Seebold* impermissibly expanded the Pennsylvania Supreme Court's holding in *DiMarco* and the Superior Court's own decision in *Troxel.* The *Seebold* court stated that *DiMarco* and *Troxel,* even if correctly decided, dealt only with the obligation of a physician to give advice to his or her own patient. These cases cannot be relied upon as establishing that a physician

has a duty to take affirmative steps to directly advise third-party non-patients in a prison environment or elsewhere. The court said that *DiMarco* and *Troxel* do not hold and cannot be fairly read to hold that a doctor's duty to third persons includes conveying information to third persons (i.e., persons outside the doctor-patient relationship). *Id.* at 1243.

*Seebold* criticized the plaintiff for downplaying the nature of the duty in *DiMarco* and *Troxel* (doctor's duty to accurately advise a patient) and for focusing too closely on the foreseeability of harm to third parties resulting from the absence of protective measures.

The *Seebold* Court limited *DiMarco* and *Troxel* to a physician's duty to accurately advise a patient regarding the patient's communicable disease. The duty "was not to identify, seek out provide information to, or otherwise take affirmative steps outside the physician-patient relationship to protect third-party non-patients." *Id.* at 1243. At 1243 n.16, the court stated that on the subject of legal duties most scholars conclude "there is generally no duty to protect or rescue where the defendant has not engaged in risk-causing conduct; and that the no-duty precept is subject to exceptions in special circumstances where the defendant may be said to have an affirmative duty."

The *Seebold* court stated that *Emerich v. Phila. Center for Human Dev., Inc.*, 720 A.2d 1032 (Pa. 1998), is the only decision in which the Supreme Court has imposed such a duty on a healthcare professional to convey information (i.e., a warning) to an at-risk third party.

In *Emerich*, the patient advised his counselor during a

therapy session that his former girlfriend was returning that day to the apartment where the patient and former girlfriend had lived to retrieve her clothing and that he was going to kill her if he found her removing her clothing from the apartment. On that day, she returned to the apartment, and he killed her. The estate of the former girlfriend brought a lawsuit based on the counselor's failure to properly warn the victim and others, including the police, that the patient presented a clear and present danger of harm to the victim. The controlling issue was whether the law should impose a duty on a mental healthcare professional to warn a person who is not a patient of imminent harm. In its opinion, the court stated: "…[i]n determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than 'the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection' from the harm suffered. Thus, recognition of a duty is in essence one of policy considerations." *Id.* at 1039 (citations omitted). The court concluded that it is reasonable to impose a duty on a mental health professional to warn a third-party of an immediate, known and serious risk of potentially lethal harm. For the duty to be imposed, there must be the existence of a specific and immediate threat of serious bodily injury that has been communicated to the professional. The threat must be made against a specifically identified or readily identifiable victim, and the professional should have determined under the standards of the mental health professional that the patient presents a serious danger of violence to the third party. The court found this duty arises out of the special relationship between a mental health professional and the patient

who has communicated to the professional a specific and immediate threat of serious bodily injury. In this instance, the professional bears a duty to exercise reasonable care to protect the third party by warning the third party of such danger. *Id.* at 1039-41.

The *Seebold* opinion, 57 A.3d at 1244, limited the reach of *Emerich* to its facts:

> The only decision in which the Court has imposed a duty upon a healthcare professional to convey information (*i.e.*, a warning) to an at-risk third party is *Emerich*, which is unique in many respects and has been expressly cabined by the Court. As PHS and its *amici* have related, there is no targeted threat of imminent violence here; the Court has stressed that *Emerich* is so limited, *see Emerich*, 554 Pa. at 227, 720 A.2d at 1041; *Witthoeft*, 557 Pa. at 353, 733 A.2d at 630; and thus, *Emerich* cannot reasonably serve as a springboard for the imposition of new and broader duties upon healthcare providers vis-à-vis third-party non-patients.

In deciding whether the PHS staff owed a duty of care to a corrections officer, the *Seebold* Court considered its prior opinion in *Estate of Witthoeft v. Kiskaddon*, 733 A.2d 623 (Pa. 1999). In the *Witthoeft* case, Ms. Myers had been a regular patient of the defendant, a licensed physician whose practice of medicine was limited to ophthalmology. The physician had performed an examination of Ms. Myers that revealed her visual acuity was sufficiently poor as to require the physician by statute to report the test results to the Department of Transportation. The physician failed to inform Ms. Myers that she was not legally authorized to

drive a motor vehicle in Pennsylvania and failed to report the results of the examination to PennDOT. Subsequently, while driving, Ms. Myers struck a bicyclist, resulting in the bicyclist's death. *Id.* at 624-25.

The estate of the bicyclist brought an action against the physician for failure to report the patient's poor vision to the Department of Transportation. The trial court and the Superior Court granted the physician's preliminary objections in the nature of a demurrer. Id. at 625. The Pennsylvania Supreme Court affirmed.

The Supreme Court initially addressed the issue of whether the reporting legislation creates a private right of action. The court concluded that it did not do so because the General Assembly has not so expressly provided and because there is no statutory language to imply the same. *Id.* at 627-28.

The *Witthoeft* court next considered the plaintiff's reliance on *DiMarco* as establishing a common law duty to the plaintiff. It distinguished *DiMarco* on the ground that the present case involved a diagnosis of poor vision, "certainly not a communicable disorder or a disorder of imminent threat to health" and "a condition of which the patient is well aware." *Id.* at 628. Thus, the policy justifications which supported the *DiMarco* decision are notably absent in the *Witthoeft* case.

The *Witthoeft* court, after distinguishing *DiMarco*, discussed *Crosby by Crosby v. Sultz*, 592 A.2d 1337 (Pa. Super. 1997), which it found to be instructive. In *Sultz*, the plaintiffs suffered injuries when struck by a motor vehicle operated by Jackson. The plaintiffs asserted that

Jackson's diabetes caused him to sustain a temporary lapse of consciousness, which resulted in the accident. The plaintiffs sued Dr. Sultz who had been treating Jackson for his condition. The court found that even if Dr. Sultz had a duty to disclose Jackson's name to the Department of Transportation, if could find "no logical connection between that obligation and a duty of care to the [plaintiffs]. The [plaintiffs] were not foreseeable victims of Dr. Sultz's actions or inactions" and "to discount the important element of foreseeability here is effectively to overrule well-established and precedential tort law, as well as to extend liability limitlessly to treating physicians vis-à-vis third-party victims." *Crosby*, 592 A.2d at 1345 (emphasis in original).

The *Witthoeft* court made the following ruling:

Having considered these cases, we agree with the Superior Court that the issue in the present matter is more akin to *Crosby* than to the situation in *DiMarco*. It may be reasonably foreseeable that a patient exposed to an infectious and communicable disease will injure a third party unless property informed to prevent the spread of the disease. However, we believe that if is an unreasonable extension of the concepts of duty and foreseeability to broaden a physician's duty to a patient and hold a physician liable to the public at large within the factual scenario of this case. This is especially true where, as here, Dr. Kiskaddon did not cause or aggravate a medical condition that affected the patient's driving and the patient was necessarily aware of her medical condition.

Appellants' decedent is simply not a foreseeable victim that this court will recognize. We will not stretch foreseeability beyond the point of recognition for to do so will be to make liability endless. To allow liability in this case would be to make physicians absolutely liable for the various acts of their patients. This we will not countenance.

733 A.2d at 630.

In *Seebold*, the court clarified its position concerning foreseeability in *Witthoeft*, stating that *Witthoeft* could not be read to suggest that foreseeability was entirely lacking under the circumstances, namely that a vision-impaired driver would have an accident. The court explained that the statement that the plaintiff's decedent was not a foreseeable victim "does not suggest that the court believed that it was unforeseeable that an accident might occur. Rather, the context reveals the Court was prioritizing other policy factors over such obvious foreseeability." 57 A.3d at 1249 n. 25.

At n. 26, the *Seebold* court discussed the foreseeability requirement as follows:

Foreseeability, of course, remains a factor in duty assessments undertaken by Pennsylvania courts unless and until the matter is raised, preserved, and reconsidered on developed advocacy. Our point above is that it is not necessarily a dominant factor, as Appellee's arguments suggest.

In summary, what I conclude from *Seebold* is (1) foreseeability is not necessarily the critical factor in

deciding whether UPMC shall be liable to plaintiffs for UPMC's failure to report; (2) since UPMC did not create the risk (but only failed to prevent the harm), UPMC is not liable to third persons whom it never treated in the absence of a court-created duty; (3) the default position would avoid the creation of a new duty unless the court is able to see with reasonable clarity the results of the decision and to determine with reasonable certainty that the change will serve the best interests of society; and (4) the case law which permits recovery where there is no relationship between the plaintiff and the defendant must be narrowly constructed because of the Supreme Court's "stated concern about imposing liability upon healthcare providers without limits." 57 A.3d at 1240.

The analysis in *Seebold* provides a context for the application of the five factors set forth in *Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000), which should be balanced in determining whether a duty should be imposed. The factors are: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor's conduct; and (5) the overall public interests in the proposed solution.[7]

In this case, plaintiffs contend that the factors favor plaintiffs' position because UPMC is being asked only to comply with a reporting requirement, a burden that can be easily met; thus, UPMC should be liable to all persons

---

7. A determination of whether to impose affirmative common law duties as a predicate to civil liability is a matter of law. *Seebold*, 57 A.3d at 1243.

who were exposed to Kwiatkowski. The difficulty with that argument is that it ignores inevitable employee error. In all likelihood, UPMC, as an institution, intends to comply with federal regulations. However, there will never be 100 percent compliance because of employee error. Thus, the question to be resolved is whether UPMC should be exposed to potentially limitless liability because of simple employee error.

It is my reading of the case law that the answer is "no." The default position articulated in *Seebold* is that a court should decline to impose new affirmative duties of care and should be especially reluctant to recognize a duty of care where liability to third parties is open-ended and the possible financial impact on the healthcare provider is limitless.[8] The case law imposes on UPMC only a duty to protect its patients from harm caused by their coming into contact with Kwiatkowski; there is no appellate court case law which supports plaintiffs' contention that UPMC owed a duty of care to plaintiffs with whom UPMC shared no relationship.[9]

## II. PRELIMINARY OBJECTIONS-MAXIM

---

8. Footnote 3 of plaintiffs' brief in opposition to UPMC's preliminary objections to plaintiffs' amended complaint states that at Hays Medical Center alone, approximately 475 patients were potentially exposed to Kwiatkowski's hepatitis C during his four months of employment and that at Exeter Hospital in New Hampshire, where Kwiatkowski worked after his time at Hays, up to 3,300 patients were potentially exposed to Kwiatkowski's hepatitis C, and at least 32 patients have been identified as infected.

9. If the very recent opinion of the Superior Court of New Hampshire upon which plaintiffs rely (*Rohveer v. Exeter Hospital*, 2012-CV-781) had been a Pennsylvania common pleas court opinion, it would have been reversed by the Pennsylvania appellate courts based on the case law upon which I have relied.

## COUNT IV-NEGLIGENCE (MAXIM)

Plaintiffs describe Maxim as a provider of staffing services to healthcare facilities. Plaintiffs' negligence claim is based on Maxim's failure to report Kwiatkowski's theft, use and/or diversion of controlled substances to any state, federal, or other governmental agency. Plaintiffs allege that Maxim knew or should have known that without intervention Kwiatkowski would continue to engage in the theft of controlled substances while employed at other healthcare facilities. I agree.

However, I also agree with Maxim that it had no duty to plaintiffs to report any information received from UPMC regarding Kwiatkowski's theft of drugs.

Maxim did not possess, administer, dispense, or distribute controlled substances. It did not supervise Kwiatkowski while he was working at UPMC. Maxim's activities were not covered by the regulatory scheme implemented to combat drug abuse.

Plaintiffs do not offer any guidance as to when or to whom Maxim should have reported what it had learned, apparently from UPMC. Plaintiffs do not explain why Maxim would be expected to report what UPMC-as an entity that possesses, administers, dispenses, and distributes controlled substances-is required to report under federal and state laws.

For these reasons, I am dismissing plaintiffs' negligence causes of action against Maxim.

## ORDER OF COURT

On this 20th day of June, 2013, it is hereby ordered

that UPMC's preliminary objections seeking dismissal of counts I, II, and III and Maxim's preliminary objections seeking dismissal of count IV are sustained, and all claims raised against UPMC Presbyterian Shadyside and Maxim Healthcare Services, Inc. are dismissed.