**Leslie SPIERLING, Appellant,**

v.

**FIRST AMERICAN HOME HEALTH SERVICES, INC., and Integrated Health Services, Inc., Appellees.**

Superior Court of Pennsylvania.

Argued April 21, 1999.

Filed Sept. 1, 1999.

Reargument Dismissed Sept. 24, 1999.

John E. Stember, Pittsburgh, for appellant.

Michael Torchia, Jenkintown, for appellees.

Before EAKIN, SCHILLER and BROSKY, JJ.

BROSKY, J.

¶ 1 Leslie Spierling ("Spierling") appeals from the July 13, 1998 trial court order granting Defendant–Appellees First American Home Health Services, Incorporated ("First American") and Integrated Health Services, Incorporated's ("Integrated Health")[1] preliminary objections and dismissing Spierling's complaint.

¶ 2 On May 13, 1998 Spierling filed a two-count complaint against First American and Integrated Health in the Court of Common Pleas of Allegheny County. In Count I she alleged that she was wrongfully terminated after she reported suspected evidence of Medicare fraud, and at Count II she alleged that her wrongful termination constituted age discrimination under the Pennsylvania Human Relations Act.[2] Spierling sought damages in excess of $25,000 for lost wages, loss of professional status and reputation, and emotional distress.

¶ 3 In November 1991 Spierling was hired as a registered staff nurse by First American and three months later she was promoted to Supervisor of Staff Nurses. In 1993 she became an administrator at one of First American's offices, and held that position until her termination on June 28, 1996. In January 1996 First American filed for Chapter 11 Bankruptcy in the Southern District of Georgia and, as a result of the bankruptcy, Integrated Health became the successor corporation to First American and assumed all of its debts and liabilities.

¶ 4 During the course of Spierling's employment, the federal government con-

---

**1.** Integrated Health is the successor corporation to First American.

**2.** Spierling was forty years old when the lawsuit was filed.

ducted an investigation of First American regarding Medicare fraud.[3] The federal investigators notified Spierling and other First American employees that an "800" number fraud hotline existed and the employees were told by the investigators to utilize it to report suspected Medicare fraud. Spierling reviewed "old and discarded" files in First American's Shadyside Office (located in Pittsburgh) and found evidence of what she believed to be past Medicare fraud. Spierling's Complaint at p. 2, par. 7. She notified her supervisor, Joan Russo, who in turn reported it to Regional Vice President Karen Ferrari; Ms. Russo also provided the information to the fraud hotline.

¶ 5 Three days after the information was forwarded to the hotline, Ms. Ferrari traveled to Pittsburgh and terminated the employment of Spierling and Russo. Spierling also averred in her complaint that relevant records were shredded in the week following her termination. Spierling also alleged in her discrimination complaint filed with the Pennsylvania Human Relations Commission ("PHRC"), which was considered by the trial court before it ruled on Appellee's preliminary objections to both counts of Spierling's complaint, that Defendant–Appellees had no legitimate reason to fire her and that they refused to provide any explanation regarding why she was terminated. She also alleged in the PHRC complaint that she was told that if she did not dispute the termination, then future prospective employers of Spierling would be informed that she was terminated from First American because of "downsizing".

¶ 6 Spierling's complaint also states that, "Both State and Federal Governments have a strong policy protecting individuals who report Federal Fraud." Spierling's Complaint at p. 2, par. 12.

¶ 7 In July 1996 Spierling, immediately after her termination, retained counsel. She subsequently obtained an Equal Employment Opportunity Commission ("EEOC") preliminary form entitled General Intake Questionnaire; she dated the form as of December 25, 1996 and filed the form on January 3, 1997. On March 27, 1997 Spierling filed a formal charge of discrimination with the EEOC but never filed a claim with the PHRC for a state age discrimination claim; the EEOC cross-filed the claim with the PHRC.

¶ 8 The trial court also considered the EEOC Intake Questionnaire before it ruled on both counts of Spierling's complaint. In the Questionnaire Spierling averred that: prior to her termination she had been given excellent evaluations by her supervisor; Defendant–Appellees' termination of her employment deviated from normal company procedures, which entailed notice, counseling, retraining and probation; three other supervisors were also terminated after they reported suspected evidence of Medicare fraud; Spierling was told that if she did not contest her termination then prospective future employers would not be given negative references; and, that she was told by supervisory personnel at First American to report any evidence of fraud, utilizing the hotline. EEOC General Intake Questionnaire, 12/25/96.

¶ 9 As mentioned, *supra*, the instant lawsuit was filed on May 13, 1998. On June 18, 1998 Defendant–Appellees filed preliminary objections in the nature of a demurrer. In regard to Count I, they stated that it should be dismissed since Pennsylvania does not have a "Whistleblowers Law" for private sector employees nor a public policy exception for at-will employees such as Spierling. Regarding Count II, they alleged that it should be dismissed since Spierling failed to timely file her administrative complaint under the PHRA.

¶ 10 All parties filed briefs and oral argument was held. On July 13, 1998 the

**3.** Eventually, First American was assessed a substantial fine and its corporate president was sentenced to a term of imprisonment as a result of Medicare fraud.

Honorable Ronald W. Folino granted Defendant–Appellees' preliminary objections and dismissed Spierling's complaint. Spierling then filed the instant appeal.[4]

¶ 11 Spierling's statement of question presented is as follows:

> Did the lower court err in granting Defendants' demurrer and dismissing Plaintiff's public policy wrongful discharge count where Plaintiff, a nurse-administrator, alleged that she had been terminated for reporting evidence of Medicare fraud to her immediate supervisor, where Plaintiff had an obligation to report such evidence under state and federal law, and where she had been instructed to look for such evidence by her employer?

Spierling's Brief at 2.

¶ 12 Our Supreme Court stated in *Shick v. Shirey,* 552 Pa. 590, 716 A.2d 1231 (1998),

> For purposes of reviewing the dismissal of a complaint based upon preliminary objections in the nature of a demurrer, the averments of the complaint must be taken as true, except to the extent that they constitute conclusions of law. *Willet v. Pennsylvania Medical Catastrophe Loss Fund,* 549 Pa. 613, 702 A.2d 850 (1997).
>
> Since sustaining the demurrer results in a denial of the pleader's claim or dismissal of his suit, a preliminary objection in the nature of a demurrer should be sustained only in cases that clearly and without a doubt fail to state a claim for which relief may be granted.... If the facts as pleaded state a claim for which relief may be granted under any theory of law then there is sufficient doubt to require the preliminary objection in the nature of a demurrer to be rejected. *County of Allegheny v. Commonwealth of Pennsylvania,* 507 Pa. 360, 372, 490 A.2d 402, 408 (1985).

*Id.* at 594, 716 A.2d at 1233.

¶ 13 Hence, we must accept as true the averments in Spierling's complaint that she uncovered evidence of past Medicare fraud on the part of Appellees and was fired for reporting the alleged fraud. *Id.*

¶ 14 Our Court stated in *Hennessy v. Santiago,* 708 A.2d 1269 (Pa.Super.1998),

> It is well established that Pennsylvania recognizes the at-will employment doctrine. As this Court has noted, however, there are a few, narrow public policy exceptions to the at-will employment doctrine:
>
> These exceptions fall into three categories: an employer (1) cannot require an employee to commit a crime, (2) cannot prevent an employee from complying with a statutorily imposed duty, and (3) cannot discharge an employee when specifically prohibited from doing so by statute. [Citation omitted.]

*Id.* at 1273.

¶ 15 Our Supreme Court also stated in *Shick v. Shirey, supra,*

> Pennsylvania law recognizes the doctrine of at-will employment so that, as a general rule, no cause of action exists based upon an employer's termination of an at-will employment relationship.
>
> . . . .
>
> Generally, an employer "may discharge an employee with or without cause, at pleasure, unless restrained by some contract." *Henry v. Pittsburgh & Lake Erie Railroad Company,* 139 Pa. 289, 297, 21 A. 157 (1891). "Absent a statutory or contractual provision to the contrary, the law has taken for granted the power of either party to terminate an employment relationship for any or no reason." *Geary v. U.S. Steel Corporation,* 456 Pa. 171, 175, 319 A.2d 174, 176 (1974). The employer's privilege to dismiss an employee with or without cause

**4.** Spierling agrees that the trial court properly dismissed Count II of her complaint, and states that this appeal only involves Count I of her complaint.

is not absolute, however, and may be qualified by the dictates of public policy.

. . . .

[There are] exceptions to the general rule that there is no common law cause of action against an employer for dismissal of an at-will employee where the dismissal would threaten clear mandates of public policy. It may be granted that there are areas of an employee's life in which his employer has no legitimate interest. An intrusion into one of those areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened. The notion that substantive due process elevates an employer's privilege of hiring and discharging his employees to an absolute constitutional right has long since been discredited. . . . [W]here the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public is violated thereby, an employee at will has no right of action against his employer for wrongful discharge. *Geary*, 456 Pa. at 184, 319 A.2d at 180 (footnote omitted).

. . . .

We reject the narrow view espoused by Shirey that what is cognizable as public policy is only that which has been legislatively enacted[.]

It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that court may constitute itself the voice of the community in so declaring. There must be a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction of what is just and right and in the interests of the public weal.

[W]e acknowledge[ ] the power of courts to pronounce public policy [as] contrasted [to] the power of the legislature.

Public policy, in the administration of the law by the courts, is essentially different from what may be public policy in the view of the legislature. With the legislature, it may be, and often is, nothing more than expediency. The public policy which dictates the enactment of a law is determined by the wisdom of the legislature. Public policy ... with the legislature may be, and often is, nothing more than expediency; but with the courts, it must, and may only, be a reliance upon consistency with sound policy and good morals as to the consideration or thing to be done.

[T]he courts may in a proper case, in the absence of a legislative pronouncement, determine what is against public policy.

. . . .

Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest.

Where the legislature has spoken, however, we will not interpret statutory provisions to advance matters of supposed public interest. [Citations omitted.]

*Id.* at 594, 596, 597, 600, 601, 602, 716 A.2d at 1233, 1234, 1235, 1236, 1237.

¶ 16 We reiterate that Spierling is only appealing the trial court's grant of Appellee's preliminary objections relating to Count I of her complaint (*i.e.*, wrongful termination for reporting past alleged Medicare fraud), and she agrees that the trial court properly dismissed Count II of her complaint (relating to age discrimination). Moreover, Spierling is not basing her claim on the Whistleblower Law, 43 P.S. § 1421 *et seq.* She is basing her claim on the public policy exception to the at-will employment doctrine.

¶ 17 First, Spierling alleged in the materials evaluated by the trial court that she was instructed by a First American supervisor to report any instances of Medicare fraud to the hotline established by the federal investigators; hence, we must assume, in reviewing the trial court's order

granting Appellee's preliminary objections, that Spierling, a registered nurse and administrator for Appellees, was obligated by her employer to report any suspected Medicare fraud. However, even accepting Spierling's allegations as true, we are unfortunately unable to afford her any relief since our review of the statutes and case-law cited by Spierling impose no duties and threat of penalties for failure to take the action that she did (*i.e.*, uncovering and reporting past suspected Medicare fraud).[5]

¶ 18   The Professional Nursing Law, 63 P.S. §§ 211–225.5, cited by Spierling, affords her no relief (she cites to no applicable sections), nor do the Pennsylvania Code sections,[6] relating to nursing, cited by Spierling since they do not mandate that she report, under threat of penalty, the sort of past alleged fraud discovered by her when reviewing First American's "old and discarded" files.

¶ 19   Additionally, Spierling's reporting of alleged fraud regarding the old and discarded files does not implicate 18 U.S.C. § 1001, 18 U.S.C. § 287, 42 U.S.C. §§ 1320a–7a and 1320a–7b, 31 U.S.C. § 3729 or 31 U.S.C. § 3730(h), all cited by Spierling.

¶ 20   Since Spierling did not plead and has not cited to any legal authority which imposed a statutory duty upon her to search "old and discarded" files for evidence of Medicare fraud and report the alleged fraud to the federal investigators, we can afford her no relief on public policy considerations and are constrained to affirm the trial court order granting Defendant–Appellees' preliminary objections and dismissing Spierling's complaint.[7]   Since Spierling was under no statutorily imposed duty to report the suspected past Medi-care fraud, Defendant–Appellees did not request that Spierling commit a crime and there was no specific statutory prohibition against Spierling's discharge, we find that Defendant–Appellees were within their rights to discharge her as an at-will employee. *Shick v. Shirey, supra; Hennessy v. Santiago, supra; Field v. Philadelphia Electric Company,* 388 Pa.Super. 400, 565 A.2d 1170 (1989).

¶ 21   Order affirmed.

¶ 22   SCHILLER, J., files a Dissenting Opinion.

SCHILLER, J., dissenting:

¶ 1   I respectfully dissent. I find it unconscionable on the eve of the twenty-first century, that a well-regarded employee who has been told to report Medicare fraud can be summarily discharged for doing so simply because she is an "at-will" employee. As the Pennsylvania Supreme Court recognized twenty-five years ago,[8] the shield afforded employers by the employment-at-will doctrine must give way when clear mandates of public policy are at stake. Exercising the right to report fraud in Medicare, a program paid for by the wages of each working American to benefit every citizen, disabled or over the age of sixty-five, is such a mandate.

¶ 2   The facts of this case are egregious. Until Leslie Spierling was abruptly fired in June 1996, she had a highly successful five-year career as an employee of First American Home Care ("First American"). Spierling was hired in November 1991 as a field staff nurse. Within three months, she was promoted to an administrative position as staff nurse supervisor,

---

**5.** Spierling went through older, not current, files of First American to discover the alleged fraud. There is no contention that the files in question were open and being forwarded to Medicare for consideration or payment. Spierling admits in her complaint that the files were "old and discarded" and that the alleged "fraud had taken place in the past." Spierling's Complaint at p. 2, par. 7.

**6.** 49 Pa.Code § 21.18

**7.** We reiterate that Spierling is not contesting the trial court's dismissal of Count II of her complaint.

**8.** *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974).

and in March 1993, she was again promoted to the position of Administrator of First American's Shadyside Agency in Pittsburgh. Spierling's evaluations were excellent and, during her tenure at Shadyside, her office, in contrast to many others, ran a profit.

¶ 3 During Spierling's employment, First American was investigated for Medicare fraud. As part of that investigation, the federal government instituted a Medicare hotline for the reporting of Medicare fraud in First American's offices. All employees, including Spierling, were notified of its availability and told to use it if Medicare fraud was suspected. In August 1995, First American was indicted for improperly claiming Medicare reimbursement for personal flights, political contributions, "ghost employees" and lobbying. The company was convicted of Medicare fraud on February 4, 1996. Subsequently, First American filed for bankruptcy, independent managers were appointed, and in June 1996, an initial plan to merge with Integrated Health Services, Inc., was filed in the United States Bankruptcy Court in the Southern District of Georgia. Payment of First American's liability for Medicare overpayments was integral to this plan, and negotiations with the U.S. Departments of Health and Human Services and Justice continued for several months.[9] A final merger plan was filed on September 13, 1996.

¶ 4 In this context, on June 25, 1996, Leslie Spierling found files that evidenced past Medicare fraud in the office she managed. She reported her discovery to her supervisor. Her supervisor, Joan Russo, in turn reported the information to the hotline and then to First American's regional vice president, Karen Ferrari. Three days later, Karen Ferrari came to the Shadyside office and fired Spierling, saying she was being terminated "at-will," and if she "was quiet about this matter, [First American] would inform prospective employers that [she] had been downsized."[10] The following week, the records in Joan Russo's office were shredded at the direction of Karen Ferrari.

¶ 5 In finding that First American "was within their rights to discharge [Ms. Spierling] as an at-will employee" the majority takes refuge in a nineteenth century doctrine which, now as then, gives employers an almost absolute right of discharge over at-will employees.[11] *See* Lawrence E. Blades, *Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power,* 67 Colum. L.Rev. 1404, 1405–06 (1967). The "employment-at-will" doctrine emerged in the United States not as an outgrowth of English common law, but rather as a unique

9. In the early 1990s, First American was the largest health care service provider in the country. The company's revenues, 97% of which were derived from Medicare and Medicaid payments, were over $500 million annually. The sentence entered after First American's conviction included a $7 million fine and restitution of $2.9 million. The company's liability for Medicare overpayments through December 1996, initially thought to be $60 million, was ultimately set at $235 million.

10. Joan Russo was terminated on the same day. Russo, however, filed her wrongful discharge claim in the bankruptcy court in the Southern District of Georgia where First American filed its bankruptcy petition. That court denied First American's motion to dismiss, citing to Pennsylvania case law and finding that a clear mandate of public policy exists to prevent Medicare fraud.

11. To this day, the United States remains almost alone in the industrialized world in failing to provide employees with general legal protection against unjust dismissal. The majority of European nations, Japan and Canada, currently have in place broad statutory protection, as do many developing nations. Even in the nineteenth century, when the common law doctrine of "mutuality of obligation" resulted in the rule that employment could be terminated by either party for any reason or no reason, English, German and French law, tempered the rule's harshness by requiring reasonable notice to an employee. *See generally* Clyde W. Summers, *Individual Protection Against Unjust Dismissal: Time for a Statute,* 62 Va. L.Rev. 481, 485 (1976).

development catalyzed by a single scholarly treatise.[12] Clyde W. Summers, *Individual Protection Against Unjust Dismissal: Time for a Statute*, 62 Va. L.Rev., 481, 485 (1976). Wood's formulation of the doctrine was unambiguous: "[w]ith us, the rule is inflexible, that a general or indefinite hiring is *prima facie* a hiring at will...." Horace G. Wood, *Law of Master & Servant*, 277 (1877). Quickly adopted by the courts,[13] application of the new doctrine was equally straightforward. Jay M. Feinman, *The Development of the Employment at Will Rule*, 20 Am. J. Legal Hist. 118, 126 (1976) (hereinafter *Employment at Will*). An employer may discharge "for good cause, for no cause, or even for cause morally wrong, without being thereby guilty of legal wrong." *Payne v. Western & A.R.R.*, 81 Tenn. 507, 519–20 (1884), *overruled on other grounds, sub nom.*

*Hutton v. Watters*, 132 Tenn. 527, 179 S.W. 134 (1915).

¶ 6  As many legal historians have observed, ready acceptance of the "employment-at-will" rule reflected its compatibility with contractual law of the time and the complementary relationship between contractual law and the prevailing principles of *laissez faire* economic theory. Summers, *supra*; Blades, *supra*. But *cf.* Feinman, *supra* (arguing that the explanation for the rise of the employment-at-will doctrine is its role as an adjunct in the development of capitalism rather than its relationship to concepts within contract law). From the end of the nineteenth century until the mid–1930s, the United States Supreme Court repeatedly struck down state legislation protective of employees using doctrines intrinsic to contract law such as "liberty of contract" and "mutuality of obligation".[14]  Courts turned

12. The rule first appeared in Horace G. Wood's 1877 treatise *Law of Master & Servant*. Wood did not follow the traditional English view that all hirings were presumed to be for one year, a rule he claimed, without basis, had not been followed recently in this country. Moreover, the four cases he cited as authority for his position did not support his theory. Nevertheless, Wood succeeded in resolving confusion in the traditional law of master-servant, and made clear that all employment relationships, not just those of a domestic nature, were to be covered by the new doctrine. J. Peter Shapiro & James F. Tune, Note, *Implied Contract Rights to Job Security*, 26 Stan. L.Rev. 335, 341–43 (1974); *see also* Summers, *supra*; Jay M. Feinman, *The Development of the Employment at Will Rule*, 20 Am. J. Legal Hist. 118, 125–27 (1976) (hereinafter *Employment at Will*).

13. The New York Court of Appeals adopted Wood's rule in *Martin v. New York Life Ins. Co.*, 148 N.Y. 117, 42 N.E. 416 (1895). In the subsequent two decades, two thirds of the thirty cases involving duration of an employment contract were decided *against the plaintiff* using the new employment-at-will doctrine. *Employment at Will supra*, at 128–29.

14. The paradigmatic case representing the now discredited era of substantive due process was *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), which struck down a state law prohibiting bakers from working more than 10 hours a day on the

basis of the inviolability of "freedom of contract." However, well before *Lochner*, the Pennsylvania Supreme Court decided the first case in the nation affecting factory wage labor, invalidating, again on the basis of "liberty of contract," a Pennsylvania statute that required that all laborers "in and around the state's iron mills" be paid their wages at regular intervals and in cash. *Godcharles v. Wigeman*, 113 Pa. 431, 6 A. 354 (1886). The statute sought to end a fundamental abuse endured by nineteenth century workers—the 'truck system' of paying workers in 'scrip,' or 'orders,' redeemable only at company or 'truck' stores. The system originated in rural towns built from scratch by a mine, mill or factory owner where the corporation often owned everything from church and school to houses and stores. William E. Forbath, *The Ambiguities of Free Labor: Labor and Law in the Gilded Age*, Wis. L.Rev. 767, 796 (1985). "From a worker's perspective life ... consisted of almost unbroken dependency. Receiving clothing and food for one's labor smacked of slavery. Debts to the company stores fastened workers to the mines and factories and the stores' monopolies enabled companies to charge above market prices for the groceries and other provisions...." *Id.* Our Supreme Court, however, found the act was "an insulting attempt to put the laborer under a legislative tutelage, which is not only degrading to his manhood, but subversive of his rights as a citizen of the United States." *Godcharles, supra* at 437.

a blind eye to the realities created by the extreme imbalance of power between employer and employee,[15] and, in the area of discharge, upheld a doctrine that enabled employers to terminate employees for any reason and protected them from liability even for abusive firings.[16] Over ensuing decades, obvious inequities resulting from the rule led both legislatures and courts to limit the at-will doctrine, shielding some workers from the unbridled power of employers.[17] In addition to statutory protection, state courts, in particular, fashioned remedies for unjust discharge, including, *inter alia,* theories based on an implied-in-fact contract, on implied covenants of good faith and fair dealing, on the creation of contractual rights in employment manuals and on public policy exceptions. The latter, invoked in the case before us, defines certain limited occasions when an employer's termination of an employee contravenes public policy. Despite these efforts,

the employment-at-will doctrine is alive and well and the common law presumption that employment is at-will still predominates. Summers, *supra* at 491.

¶ 7 In Pennsylvania, the at-will doctrine was officially adopted in *Henry v. Pittsburgh & Lake Erie R. Co.*, 139 Pa. 289, 21 A. 157 (1891). The Pennsylvania Supreme Court held that an employee may be discharged "with or without cause, at pleasure, unless restrained by some contract; ... questions of malice and want of probable cause have [nothing] to do with the case." *Id.* at 297, 21 A. at 157. The rule remained unassailable for eight decades until *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974), where our Supreme Court in *dicta* recognized that there are "areas of an employee's life in which his employer has no legitimate interest." *Id.* at 184, 319 A.2d at 180. The majority concluded that, although there was no compelling public pol-

**15.** For laborers, the freedom of "liberty of contract" was illusory. Labor leaders in the nineteenth century bluntly asked how much this abstract right was worth without the power to exercise it. Forbath, *supra* at 810. Their answer was equally to the point:

> "The laborer's commodity perishes everyday beyond possibility of recovery. He must sell today's labor today or never.... An empty stomach can make no contracts." The workers "do not consent, they submit but they do not agree."

Forbath, *supra* at 811 (quoting labor leader George E. McNeill of the Eight Hour League). Indeed, the reality of laborers in factories and sweatshops across the country was poverty and degradation, conditions that led to not infrequent uprisings, violence and bloodshed. Pennsylvania's own history carries the indelible mark of the Molly Maguires, the Homestead Strike and the Lattimer massacre, all desperate attempts by hapless workers to exercise some control over the unbearable hardships faced in the anthracite fields, steel mills and factories of this state. *See generally* Paul Johnson, *A History of the American People* (1997); Samuel Eliot Morison, *The Oxford History of the American People, Vol. Three: 1869 through the Death of John F. Kennedy, 1963* (1994); Michael Novak, *The Guns of Lattimer* (1996).

**16.** Summarizing *Adair v. United States*, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436 (1908) and *Coppage v. Kansas*, 236 U.S. 1, 35 S.Ct.

240, 59 L.Ed. 441 (1915), both finding unconstitutional statutes prohibiting an employer from firing an employee because of union membership, one commentator put it succinctly:

> In the late 19[th] century the [U.S. Supreme] Court strongly endorsed the freedom of enterprise rationale and declared the right of an employer to dispense with the services of an employee is equivalent to the right of the employee to quit. The Court dispensed with the argument that differences in bargaining power rendered employment at will unjust by asserting the necessity of recognizing "as legitimate those inequalities of fortune that are the necessary result of the exercise" of contract and property rights.

Shapiro & Tune, *supra* at 347 (footnotes omitted).

**17.** Federal legislation, for example, protects individual employees from discharge under, *inter alia*, the National Labor Relations Act of 1935, Title VII of the Civil Rights Act of 1964, and the Fair Labor Standards Act of 1976. For a more comprehensive discussion of modifications of the employment-at-will rule see David Peck, Note and Comment: *The Public Policy Exception to the Employment–at–Will Rule: Illinois Creates an Amorphous Tort*, 59 Chi.-Kent L.Rev. 247 (1982).

icy under the facts of that case, an employee's discharge might give rise to a cause of action where a clear mandate of public policy is violated. *Id.* at 184, 319 A.2d at 180.

¶ 8 In concluding that termination of an employee might be actionable in certain circumstances, the *Geary* Court acknowledged what earlier courts had been unwilling to recognize:

> [H]uge corporate enterprises which have emerged in this century wield an awesome power over their employees. It has been aptly remarked that "[w]e have become a nation of employees. We are dependent upon others for our means of livelihood, and most of our people have become completely dependent upon wages. If they lose their jobs they lose every resource, except for the relief supplied by the various forms of social security. Such dependence of the mass of the people upon others for *all* of their income is something new in the world. For our generation, the substance of life is in another man's hands."

¶ 9 456 Pa. at 176, 319 A.2d at 176 (quoting F. Tannenbaum, A Philosophy of Labor 9 (1951)). Another significant aspect of the *Geary* decision is the Court's implicit recognition of a public policy interest in protecting an employee who seeks to protect the public good[18]; however, on balance, the Court found that other public policy imperatives militated against recognizing a cause of action in that case. 456 Pa. at 183, 319 A.2d at 179.[19]

¶ 10 Since *Geary*, the courts of our Commonwealth have struggled to determine when a public policy interest constitutes a "clear mandate" sufficiently compelling to justify a claim of wrongful discharge.[20] In *Reuther v. Fowler & Williams*, we found that firing an employee because he or she served on a jury was against public policy; we relied upon the necessity of having citizens freely available for jury service, as the jury system and jury service are of the highest importance in our legal process. 255 Pa.Super. 28, 386 A.2d 119, 120 (1978). In *Hunter v. Port Authority of Allegheny County*, we found that refusing to hire a prospective employee for failing to tell the employer about a pardoned conviction was against public policy; we considered the public's interest in rehabilitating former offenders and reintegrating them into society. 277 Pa.Super. 4, 419 A.2d 631, 635 (1980). Further, in *Field v. Philadelphia Electric Company*, we found that firing an employee for reporting a violation of federal nuclear regulations violated public policy; we acknowledged the importance of protecting the health and safety of the public against the dangers of radiation. 388 Pa.Super. 400, 565 A.2d 1170, 1180 (1989).[21] In each of these cases, the

---

18. George Geary was a salesman for the United States Steel Corporation, who was dismissed after he objected to selling pipe that he claimed had not been properly tested and was unsafe.

19. Justice Roberts authored a dissenting opinion in which he diverged on this very point, concluding that, "society's interest in protecting itself from dangerous products manifestly presents a mandate to the court to recognize a cause of action for wrongful discharge." *Geary v. United States Steel Corp., supra.* Justices Nix and Manderino also dissented.

20. In *Cisco v. United Parcel Services, Inc.*, 328 Pa.Super. 300, 476 A.2d 1340 (1984), this Court stated: "The sources of public policy [which may limit the employer's right of dis-

charge] include legislation; administrative rules, regulation, or decision; and judicial decision. In certain instances, a professional code of ethics may contain an expression of public policy.... Absent legislation, the judiciary must define the cause of action in case-by-case determinations."

21. The Superior Court has also recognized public policy exceptions where: (1) an at-will employee was discharged for seeking unemployment compensation to which he was entitled under Pennsylvania law, *Raykovitz v. K Mart Corp.*, 445 Pa.Super. 378, 665 A.2d 833 (1995); *Highhouse v. Avery Transp.*, 443 Pa.Super. 120, 660 A.2d 1374 (1995); and (2) an at-will employee was discharged for refusing to submit to a lie detector test, also in violation of Pennsylvania law. *Kroen v. Bed-*

Court looked to pertinent statutes and case law to ascertain whether a public policy was violated as a result of the employee's discharge.

¶ 11 Spierling urges us to adopt a public policy exception based on the strong public policy in favor of protecting an employee who reports her employer's Medicare fraud.[22] Upon reviewing applicable statutes and case law, as well as the regular bombardment of articles in newspapers, law journals and periodicals, I can only agree that providing legal recourse to an employee who is retaliated against for assisting in the elimination of health care fraud is a clear mandate of public policy.

¶ 12 Health care fraud is big business. Four of the federal government's top five "qui tam" settlements[23], amounting to more than $700 million in reimbursement, stemmed from overbilling for medical services. Margaret Cronin Fisk, *The whistleblower juggernaut*, Nat'l L.J., Aug. 9, 1999, at A13. In two other recently reported cases, the federal government has sought conviction and/or reimbursement with respect to health care fraud involving millions of dollars.[24] Health care fraud is both commonplace and costly:

As Willie Sutton said when asked why he robbed a bank, "That's where the money is." Today, the money is in health care, and it is attracting criminals like honey draws bees. Health care expenditures are expected to exceed $1.4 trillion by the year 2000. Even if only a

small portion of health care dollars were lost to fraud and abuse, the loss would be significant. For a variety of reasons, however, health care is particularly susceptible to fraud and the amount lost to fraud and abuse is large, estimated at $80–90 billion per year.

Pamela H. Bucy, *Crimes by Health Care Providers*, U. Ill. L.Rev. 589 (1996). Clearly, the public has an interest in ensuring the continued viability of the federally funded health care program by staunching this significant and unnecessary waste of taxpayer resources.

¶ 13 The public policy in favor of eliminating and punishing Medicare and Medicaid fraud is evinced by federal and state codes specifically prohibiting the filing of fraudulent claims. 42 U.S.C. § 1320a–7(b) (hereinafter "Medicare and Medicaid Fraud Act") imposes severe criminal penalties for acts involving federal health care programs. For example, under this section, whoever makes a false statement or representation in any application for payment for items or services provided under a Federal health care program is guilty of a felony punishable by a fine of not more than $25,000 or imprisonment for five years, or both. 42 U.S.C.S. § 1320a–7b(a)(i).[25]

¶ 14 Moreover, federal law provides protection for employees who are discharged in retaliation for reporting such fraud. Federal qui tam[26] suits may be

---

*way Security Agency, Inc.*, 430 Pa.Super. 83, 633 A.2d 628 (1993).

**22.** Medicare is an entirely federal program established to provide medical financing for individuals who are disabled or over 65. By contrast, Congress adopted the Medicaid Act, 42 U.S.C. § 1396 et seq., as a joint federal and state program to provide medical assistance to poor families; states are not required to participate, but if they choose to participate, they must comply with the Act and corresponding regulations. *Kulkarni v. Leean*, 1997 WL 527674, 1997 U.S. Dist. Lexis 15200 (W.D.Wisc.1997).

**23.** *See* discussion *infra*.

**24.** Karen L. Shaw, *Columbia/HCA executives convicted of fraud*, The Philadelphia Inquirer, July 3, 1999; Jonathan Ringel, *Olsten Whistleblower to Receive $9.8 million*, The Legal Intelligencer, July 22, 1999.

**25.** Pennsylvania has also enacted the Medicaid Fraud Abuse and Control Act, 62 P.S. §§ 1401–12, which is intended to eliminate fraud in the medical assistance program.

**26.** " 'Qui tam' is an adaptation of the longer phrase qui tam pro domino rege quam pro seipo, which literally means 'he who as much for the king as for himself.' This method of prosecution first gained popularity in thirteenth century England as a method of sup-

brought under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–30, which provides penalties for individuals who knowingly defraud the government and also offers incentives to whistleblowers who expose fraud. *Hopkins v. Actions, Inc.*, 985 F.Supp. 706 (S.D.Tex.1997). The purpose of the FCA is to discourage fraud against the government and encourage those with knowledge of such activities to come forward. *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. Tex.1994). Under section 3730(h) of the FCA, employees who are discharged, demoted or discriminated against for investigating, assisting in or bringing qui tam actions, shall be entitled to all relief necessary to make the employee whole. 31 U.S.C. § 3730(h).

¶ 15 This unambiguous statutory language demonstrates a clear public policy under federal law in favor of protecting individuals who are discharged for reporting Medicare fraud. *See, e.g., Hopkins v. Actions, Inc., supra*, (administrative assistant who made an intra-corporate complaint about Medicare fraud was protected under the FCA so long as she intended to file a qui tam action and so informed her employer); *Mikes v. Strauss et al.*, 889 F.Supp. 746 (S.D.N.Y.1995) (pulmonary care specialist who alleged she was fired in retaliation for investigating and reporting to her employer suspected Medicare fraud had a cause of action under the FCA).[27]

¶ 16 Relying on *Hennessy v. Santiago*, 708 A.2d 1269 (Pa.Super.1998), the majority finds no compelling public policy presented in this case stating, "Since Spierling was under no statutorily imposed duty to report the suspected past Medicare fraud, [First American] did not request that Spierling commit a crime and there was no specific statutory prohibition against Spierling's discharge, we find that [First American was] within their rights to discharge her as an at-will employee." Majority opinion, at 1254. However, in *Shick v. Shirey*, our Supreme Court did not limit the public policy exception to those criteria. Instead, the Court reviewed the Workers' Compensation Act to discern a compelling public policy in favor of protecting an employee who filed a claim under the Act. 552 Pa. 590, 716 A.2d 1231 (1998).[28] Like Spierling, Shick was under no statutorily imposed duty to report his employer's conduct, Shick's employer did not request that he commit a crime, and there was no specific statutory prohibition against Shick's discharge. Yet, the Supreme Court concluded that Shick had a claim for wrongful discharge, reasoning that the Workers' Compensation Act provides the exclusive means for an employee to obtain compensation for injuries sustained during the course of employment, and to effectuate the purposes of the Act it is necessary for an employee to be able to exercise his rights under the Act in an unfettered fashion. 552 Pa. at 604, 716 A.2d at 1237.[29]

---

plementing ineffective law enforcement." *Mikes v. Strauss et al.*, 889 F.Supp. 746, 750 (S.D.N.Y.1995) (citing *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 304 U.S.App. D.C. 347, 14 F.3d 645, 647 n. 1 (D.C.Cir.1994)).

**27.** A public policy exception in a wrongful discharge action may derive from either state or federal law. *Sorge v. Wright's Knitwear Corp.*, 832 F.Supp. 118 (E.D.Pa.1993); *Kilpatrick v. Delaware County S.P.C.A.*, 632 F.Supp. 542 (E.D.Pa.1986).

**28.** The Supreme Court found instructive the discussion of public policy earlier set forth by the Court in *Mamlin v. Genoe*, 340 Pa. 320, 17 A.2d 407 (1941), stating: "It is only when a

given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring. There must be a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction of what is just and right and in the interests of the public weal." *Shick v. Shirey*, 552 Pa. 590, 600, 716 A.2d 1231, 1235 (quoting *Mamlin, supra* at 325, 17 A.2d at 409).

**29.** The Court expressly rejected the employer's argument that the legislature's failure to amend the Act to include a retaliatory discharge provision rendered the Court power-

¶ 17 A similar argument can be made on behalf of Spierling in this case. The Medicare and Medicaid Fraud Act prohibits the filing of false claims with the federal government, and the False Claims Act encourages employees to assist in the investigation and reporting of such claims. The public has a significant interest in ferreting out and reporting the misuse of taxpayer funds; it is only through application of a public policy exception to protect employees who are fired for performing this important function that this public policy will be served. Moreover, this case is distinguishable from cases in which this Court has previously refused to recognize a public policy exception for employees who report their employer(s)' suspected illegal activities, in that there was a pre-existing investigation of the employer which resulted in a conviction for Medicare fraud, Spierling had been told by her employer to cooperate in an ongoing investigation, and had reported the fraud to her immediate supervisor rather than to governmental authorities or to a higher corporate officer.[30] At least one other state has recognized the important public policy of protecting an at-will employee fired for refusing to be complicit in an employer's

fraudulent health care billing practices. *See Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685 (1988) (medical technician who was refused permanent employment status after she discovered physician was billing Medicaid for lab work which had not been performed and refused to promise her employer that the billing practices would not be reported to the authorities, was entitled to bring suit for wrongful discharge).[31]

¶ 18 In the quarter century since *Geary v. United States Steel Corp.*, our courts have shown an increasing willingness to limit an employer's arbitrary right of discharge when public policies that strike at the heart of our common purposes are threatened. The Court has a continuing obligation to redefine the public policy exception to the at-will employment doctrine based on the fundamental interests of the common weal. As Justice Roberts aptly stated in his *Geary* dissent[32]:

> Courts are duty-bound to fashion remedies for the changing circumstances of economic and social reality. And it is far too late in the day for this Court to indulge itself by fictionalizing that the doctrine of freedom of contract justifies

---

less to recognize such a cause of action. *Shick, supra* at 602, 716 A.2d at 1237.

30. *Cf., Hennessy v. Santiago*, 708 A.2d 1269 (Pa.Super.1998) (no wrongful discharge claim for counselor for mental health patients in a group home who had no duty to report rape of a patient by another patient to authorities); *Hunger v. Grand Central Sanitation*, 447 Pa.Super. 575, 670 A.2d 173 (1996), *appeal denied*, 545 Pa. 664, 681 A.2d 178 (1996) (employee who reported his employer's suspected violation of Solid Waste Management Act, but whose charges were unsubstantiated, had no cause of action); *Krajsa v. Keypunch, Inc.*, 424 Pa.Super. 230, 622 A.2d 355 (1993) (employer terminated after complaining about employer's allegedly unlawful business practices had no cause of action where he failed to show how any statute or constitution applied to his case). *See also Holewinski v. Children's Hosp. of Pittsburgh*, 437 Pa.Super. 174, 649 A.2d 712 (1994), *appeal denied*, 540 Pa. 641, 659 A.2d 560 (1995) (nurse fired after voicing concerns over the hiring of her doctor-supervisor had no claim for wrongful discharge).

31. The United States Supreme Court also recently gave implicit recognition to an employee's right to avoid recrimination for participating in a Medicare fraud investigation. In *Haddle v. Garrison et al.*, 525 U.S. 121, 119 S.Ct. 489, 142 L.Ed.2d 502, 1998 U.S. Lexis 8081 (1998), the Court held that loss of at-will employment constitutes an "injury" to the person or property of the employee sufficient to state a claim for relief under 42 U.S.C. § 1985(2), which provides for civil liability with respect to conspiracies to injure a witness "in his person or property" as a result of that person testifying in a court of the Unites States, in a case where an employee alleged that current and former corporate officers conspired to discharge him in order to intimidate and retaliate against him for cooperating with the federal agents in an investigation of his employer for Medicare fraud and appearing to testify at the grand jury proceedings.

32. *Geary, supra* at 194, 319 A.2d at 185 (Roberts, J. dissenting).

insulation of an employer's arbitrary and abusive exercise of his power of discharge.

I believe that today's society has a compelling interest in preventing the significant waste of taxpayer funds through fraudulent billing practices by health care providers. We must ensure the availability of federally funded health care insurance for the poor, disabled, and the elderly.

¶ 19 Employees should not be sacrificed on the altar of the employee at-will doctrine for reporting suspected Medicare fraud through proper channels in the course of their employment. For these reasons, I respectfully, but vigorously, dissent from the majority's view that no public policy exception is cognizable in this case and would reinstate Spierling's cause of action for wrongful discharge.