Mark E. HOSPODAR, M.D., and
Pittsburgh Neurology Asso-
ciates, Ltd., Appellants

v.

Robert R. SCHICK, Individually and on
Behalf of Estate of Patricia A. Schick,
Deceased, and Robert M. Zeis, Individ-
ually and on Behalf of the Estate of
Sherri A. Zeis, Deceased, Appellees

Superior Court of Pennsylvania.

Argued Feb. 9, 2005.

Filed Sept. 14, 2005.

Reargument Denied Nov. 23, 2005.

James A. Wood, Pittsburgh, for appel-
lants.

John P. Gismondi, Pittsburgh, for appel-
lees.

Before: DEL SOLE, P.J., JOYCE and TAMILIA, JJ.

OPINION BY DEL SOLE, P.J.:

¶ 1 Mark E. Hospodar, M.D. and Pittsburgh Neurology Associates, Ltd. ("Appellants") appeal from the March 12, 2003, order denying their preliminary objections in the nature of a demurrer. While the appeal is interlocutory in nature, it has been accepted for appellate review pursuant to Pa.R.A.P. 1311.

¶ 2 This case arises from separate medical malpractice actions filed on behalf of the estates of Patricia A. Schick and Sherry A. Zeis in connection with a fatal automobile accident that occurred on October 18, 2000. The cases were later consolidated pursuant to a March 20, 2003, order. Appellees allege Appellants were negligent in the treatment and care of Jack Smith, the driver of the automobile that collided with Appellees' decedents' vehicle, and that Appellants' negligence was the legal and factual cause of decedents' deaths. The allegations in Appellees' complaints, as summarized by the trial court, are as follows:

On October 18, 2002, Smith operated his vehicle at a high rate of speed and in an uncontrolled fashion, and violently crashed into the rear of a stopped vehicle on Route 51 in Allegheny County, thereby causing the deaths of Shick and Zeis, occupants of the stopped vehicle. Smith's erratic driving was caused by Smith having "blacked out." Smith had previously been involved in two recent automobile accidents in which he "blacked out." Specifically, on December 21, 1998, Smith was seen at Mercy Hospital by Dr. Berkey, a representative of PNA [Pittsburgh Neurology Associates], following an automobile accident in which Smith allegedly "blacked out" at the wheel. Dr. Berkey was provided with medical information indicating that Smith had a prior history of seizures. The circumstances of the accident that were related to Dr. Berkey were consistent with the driver having had a seizure. PNA's agents did not provide Smith with any treatment for seizures nor did they suggest that he restrict his driving. On April 11, 2000, Smith was involved in another motor vehicle accident in which he claimed to have "blacked out" for no apparent reason. Smith was seen at the emergency room at Sewickley Valley Hospital where he admitted having been previously diagnosed with a seizure disorder, and being on Dilantin, an anti-seizure medication. A week later, Smith was seen by Dr. Bader, his primary care physician, who noted a previous history of Dilantin use, and indicated that Smith had a possible seizure disorder. After ordering some cardiac tests, whose results did not provide an explanation for Smith blacking out, Dr. Bader referred Smith to PNA.

On May 3, 2000, Smith was seen by Dr. Hospodar, whose records indicate that he was aware that Smith had a history of two prior "black out" automobile accidents, and that Smith lost his driver's license as a result of the second accident. Dr. Hospodar was aware that his associate, Dr. Berkey, had obtained a history from Smith in December 1998 of a possible seizure disorder. Dr. Hospodar also had knowledge of the fact that Smith had admitted a history of a seizure disorder to his primary care physician, Dr. Bader, and to the staff at Sewickley Valley Hospital. Dr. Hospodar also received specific confirmation of Smith's history of treatment for a seizure disorder. Dr. Hospodar's medical work-up of Smith failed to reveal any rational explanation for the blackouts other than a seizure disorder. Based on

the above, Dr. Hospodar and PNA were specifically aware that Smith was at a high risk for "blacking out" while driving an automobile, and that Smith could cause serious bodily injury to other persons if he were to black out while driving. Despite the above, Dr. Hospodar failed to diagnose Smith with a seizure disorder and failed to provide him with medication or any other treatment for a seizure disorder.

Following Dr. Hospodar's examination of Smith on May 3, 2000, Dr. Hospodar filled out a Pennsylvania Department of Transportation (PADOT) form which included the question, "From a medical standpoint only, do you consider [Jack Smith] physically and/or mentally competent to operate a motor vehicle?" Dr. Hospodar answered "I do not know." Plaintiffs claim that in the exercise of due care, Dr. Hospodar should have answered the question, "No." Later that month, in responding to oral follow-up questions from PADOT representatives, Dr. Hospodar advised them that it was safe for Smith to operate a motor vehicle. Approximately five months later the subject fatal accident occurred.

Trial Court Opinion, 8/31/04, at 1–3.

¶ 3 On February 13, 2003, Appellants filed preliminary objections to the complaint, arguing that they owed no duty to the third parties in this case and that the decedents were not foreseeable victims of Dr. Hospodar's actions or inactions. Following oral argument, the court denied Appellants' preliminary objections, and on March 20, 2003, consolidated the two cases and certified the matter as one involving a controlling question of law. Review was granted by this Court. *See* Pa.R.A.P. 1311.

¶ 4 Appellants now argue "the trial court erred in overruling the appellants' preliminary objections to the plaintiff's complaints when the Supreme Court has ruled that the Motor Vehicle Act does not allow for a physician to be held liable to a third party who has been injured by one of the physician's patients." Brief for Appellants at 4.

¶ 5 "Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint." *Hykes v. Hughes,* 835 A.2d 382, 383 (Pa.Super.2003) (citations omitted). Our standard of review in determining whether a trial court erred in denying preliminary objections in the nature of a demurrer is well-settled.

> When reviewing the dismissal of a complaint based upon preliminary objections in the nature of a demurrer, we treat as true all well-pleaded material, factual averments and all inferences fairly deducible therefrom. Where the preliminary objections will result in the dismissal of the action, the objections may be sustained only in cases that are clear and free from doubt. To be clear and free from doubt that dismissal is appropriate, it must appear with certainty that the law would not permit recovery by the plaintiff upon the facts averred. Any doubt should be resolved by a refusal to sustain the objections. Moreover, we review the trial court's decision for an abuse of discretion or an error of law.

*DeFazio v. Gregory,* 836 A.2d 935, 937 (Pa.Super.2003) (citations omitted).

¶ 6 Here, the trial court concluded that given Dr. Hospodar's knowledge that Smith had sustained two prior automobile accidents as a result of "blacking out," it was "readily foreseeable that Smith would become involved in another accident if he continued to drive." Trial Court Opinion, 8/31/04, at 5. The court further found "Dr. Hospodar had a duty to take steps to minimize this risk" and properly and accurately report Smith's condition to the

Pennsylvania Department of Transportation (PennDOT). *Id.*

¶ 7 The determination of whether a person is medically eligible for a driver's license in this Commonwealth is governed under 75 Pa.C.S.A. § 1501, *et seq.*, Chapter 15 of the Motor Vehicle Code. Specifically, § 1517 provides that the Secretary of Transportation shall appoint a thirteen-member medical advisory board to formulate rules and regulations regarding physical criteria that are used in determining whether an individual is fit to operate a motor vehicle. A physician's duty to advise PennDOT of a patient's potential lack of fitness to operate a motor vehicle is set forth in § 1518(b), which provides:

> (b) Reports by health care personnel.— All physicians, podiatrists, chiropractors, physician assistants, certified registered nurse practitioners and other persons authorized to diagnose or treat disorders and disabilities defined by the Medical Advisory Board shall report to the department, in writing, the full name, date of birth and address of every person over 15 years of age diagnosed as having any specified disorder or disability within ten days.

75 Pa.C.S.A. § 1518(b). Additionally, regulations promulgated by the Medical Advisory Board are set forth at 67 Pa.Code Chapter 83. Most relevant to the matter before us are Sections 83.4 and 83.5, which during the applicable time frame [1] in relevant part provided:

§ 83.4 Epilepsy

(a) *General.* A person suffering from epilepsy may not drive unless their personal, licensed physician reports that the person has been free from seizures for a period of at least one year immediately preceding, with or without medication.

§ 83.5 Other physical and medical standards

(a) *General.* A person afflicted by any one of the following conditions may not drive if, in the opinion of the examining physician, the conditions are likely to interfere with the ability to control and safely operate a motor vehicle:

.    .    .    .    .

(4) Periodic loss of consciousness, attention or awareness from whatever cause.

67 Pa.Code § 83.4(a); § 83.5(a)(4). PennDOT may recall the operating privileges of one whose incompetence to drive a motor vehicle has been established under the Code. 75 Pa.C.S.A. § 1519.

■ ¶ 8 Presently, Appellants contend that the Motor Vehicle Code only requires physicians to provide medical information regarding the conditions of certain licensed drivers to the Commonwealth so it can determine if their operating privileges should be revoked, and does not authorize a private cause of action based upon physician's failure to report a driver's condition to PennDOT. In support of this claim, appellants rely on *Estate of Witthoeft v.*

---

1. Sections 83.4 and 83.5 recently have been amended and in relevant part now provide:

(a) General. A person who has a seizure disorder will not be qualified to drive unless a licensed physician reports that the person has been free from seizure for at least 6 months immediately preceding, with or without medication. A person will not be disqualified if the person has experienced only auras during that period.

67   Pa.Code § 83.4(a).

(a) General disqualifications. A person who has any of the following conditions will not be qualified to drive:

.    .    .    .    .

(6) Periodic episodes of loss of attention or awareness which are of unknown etiology or not otherwise categorized, unless the person has been free from episode for the year immediately preceding, as reported by a licensed physician.

67   Pa.Code § 83.5(a)(6).

*Kiskaddon,* 557 Pa. 340, 733 A.2d 623 (1999). After a thorough review, we find that we must agree.

¶ 9 In *Witthoeft,* our Supreme Court was presented with the following situation: Ms. Witthoeft was riding her bicycle when she was struck by an automobile driven by Helen Myers, who had substantially impaired vision. Ms. Witthoeft later died from the injuries sustained in that accident. Her estate brought an action against Ms. Myers's ophthalmologist, Dr. Kiskaddon, in which it argued that Dr. Kiskaddon was the direct and proximate cause of Ms. Witthoeft's death because of his failure to report her sub-par vision to PennDOT. Dr. Kiskaddon filed preliminary objections in the nature of a demurrer, which were granted. This Court affirmed the trial court's action, and upon petition, our Supreme Court took up the issue for consideration. The Supreme Court rejected the estate's position, holding that the Motor Vehicle Code does not create, explicitly or implicitly, a private cause of action against a physician for an accident caused by a patient because the physician failed to comply with the notification requirements of the code.

¶ 10 The Court also refused to expand its earlier decision in *DiMarco v. Lynch Homes–Chester County, Inc.,* 525 Pa. 558, 583 A.2d 422 (1990), in which it held that a physician may be liable to a third party who is injured because of the physician's negligent treatment of a patient. In *DiMarco,* a patient was infected with hepatitis B. The physician erroneously told her that if she remained symptom free, she would no longer be infected in six weeks. He further advised her to refrain from sexual intercourse for six weeks. The patient heeded this advice; she waited eight weeks before engaging in sexual intercourse. Her partner became infected with hepatitis B, and sought to hold the physi-

cian liable. In finding a cause of action against the physician in favor of the partner, the Supreme Court relied heavily on the nature of the disorder at issue, holding that in the case of a communicable disease, the information provided by the physician is of great importance and a duty to accurately advise of the illness is reasonable; however, where the condition is not communicable, the same conclusion cannot necessarily be reached. *Witthoeft,* 733 A.2d at 628. The Supreme Court also considered the fact that the patient in *Witthoeft* was aware of her exceedingly poor vision, and was, in fact, in the best position to know of its effect on her ability to drive. *Id.* Thus, the Supreme Court declined to extend its holding in *DiMarco* to the factual situation of *Witthoeft.*

¶ 11 We find the matter before us analogous to the situation in *Witthoeft.* It is undisputed that Mr. Smith knew of his seizure disorder and knew that he had previously suffered blackouts while driving. As we are bound by the decisions of our Supreme Court, we find no third-party liability exists against Appellants.

¶ 12 Order reversed.

¶ 13 TAMILIA, J. files a dissenting opinion.

Dissenting OPINION BY TAMILIA, J.:

¶ 1 I respectfully dissent from the majority's decision relieving appellants of any responsibility for the vehicular accident which resulted in the deaths of two innocent individuals. Although I would decline to find a duty in every instance involving a physician, his patient and a third party, I believe the imposition of liability is appropriate in this situation, where the two victims in a stopped vehicle were killed as a result of being violently struck by a driver whose treating physician was aware the patient-driver had a well-documented his-

tory of seizures and yet failed to diagnose or properly report the driver's condition to PennDOT.

¶ 2 The majority, upon reviewing the record in this case and considering certain cases promulgated by the Pennsylvania Supreme Court, finds the facts in the case under review to be analogous to the Supreme Court's earlier determinations and thereby reverses the Order of the trial judge. I believe the Honorable Alan S. Penkower properly and clearly distinguished the facts in this case from the several cases delineated by the majority as controlling, and found for the plaintiffs. Having carefully reviewed the record, the law applicable to this narrow and fact-driven issue, and the findings flowing there from, I would affirm the Order of Judge Penkower.

¶ 3 This case arises from separate medical malpractice actions filed on behalf of the estates of Patricia A. Schick and Sherry A. Zeis in connection with a fatal automobile accident that occurred on October 18, 2000. Appellees alleged appellants were negligent in the treatment and care of Jack Smith, the driver of the automobile that collided with appellees' decedents' vehicle, and that appellants' negligence was the legal and factual cause of decedents' deaths. Record, No. 5.

¶ 4 Following oral argument on appellants' preliminary objections arguing that they owed no duty to the third parties in this case and that the decedents were not foreseeable victims of Dr. Hospodar's actions or inactions, the court denied the preliminary objections, and on March 20, 2003, consolidated the two cases and certified the matter for interlocutory appeal. Record, Nos. 9, 10. This timely appeal followed. Appellants now argue "the trial court erred in overruling the appellants' preliminary objections to the plaintiff's complaints when the Supreme Court has ruled that the Motor Vehicle Act does not allow for a physician to be held liable to a third party who has been injured by one of the physician's patients." Appellants' brief at 4, 10.

¶ 5 The majority Opinion correctly sets forth the applicable standards of review and Motor Vehicle Code and Medical Advisory Board regulations but, contrary to my position, agrees with appellants "that the Vehicle Code only requires physicians to provide medical information regarding the conditions of certain licensed drivers to the Commonwealth so it can determine if their operating privileges should be revoked, and does not authorize a private cause of action based upon physicians failure to report a driver's condition to PennDOT." Majority Opinion at 989.

¶ 6 To the contrary, I agree with Judge Penkower's conclusion that given Dr. Hospodar's knowledge that Smith had sustained two prior automobile accidents as a result of "blacking out," it was "readily foreseeable that Smith would become involved in another accident if he continued to drive." Trial Court Opinion at 5. The court further found "Dr Hospodar had a duty to take steps to minimize this risk" and properly and accurately report Smith's condition to the Pennsylvania Department of Transportation (PennDOT). *Id.*

¶ 7 In support of their claim, appellants rely on *Estate of Witthoeft v. Kiskaddon,* 557 Pa. 340, 733 A.2d 623 (1999) and *Crosby by Crosby v. Sultz,* 405 Pa.Super. 527, 592 A.2d 1337 (1991). *Id.* at 11, 17, 592 A.2d 1337. The majority adopts the position of appellants and relies upon their interpretation and application of *Witthoeft* as the basis for reversal of the trial court. After careful review and consideration, I would find *Witthoeft, Crosby* and *DiMarco v. Lynch Homes–Chester County, Inc.,* 525 Pa. 558, 583 A.2d 422 (1990), as cited by

the majority, to be factually distinguishable from this case.

¶ 8 *Witthoeft* involved the question of whether the estate of a bicyclist, who was killed when she was struck by an automobile driven by a patient, possessed a cause of action against the patient's ophthalmologist for failure to report the patient's substandard vision to PennDOT. *Witthoeft* at 343, 733 A.2d at 624. In *Witthoeft*, Dr. Kiskaddon performed a vision examination of the patient-driver four months prior to the accident and determined that she had visual acuity of 20/80 combined. Under the relevant reporting requirement, "[a] person with visual acuity of less than 20/70 combined vision with best correction [was] not authorized to drive." 67 Pa.Code § 83.3, Visual standards, (c). Dr. Kiskaddon, however, failed to report the results of the patient-driver's examination to PennDOT. *Witthoeft, supra.*

¶ 9 The Supreme Court found Dr. Kiskaddon owed no duty to Ms. Witthoeft "because there was no foreseeability of Ms. Witthoeft being the object of the physician's failure to notify PennDOT." *Id.* at 344, 733 A.2d at 625. In reaching this conclusion, the Court noted that neither the Motor Vehicle Code, nor the regulation requiring physicians to report patients' vision problems to PennDOT, expressly or impliedly created private cause of action for third parties. *Id.* at 345–346, 733 A.2d at 626.

¶ 10 Similarly, in *Crosby*, this Court upheld a trial court's dismissal of complaint brought against the physician of a diabetic patient who sustained a temporary loss of consciousness while driving and struck the plaintiffs, injuring them. *Id., supra* at 1338–1339. In *Crosby*, the plaintiffs maintained that the patient-driver's physician, Dr. Sultz, should have counseled him not to drive and reported him to PennDOT pursuant to the Motor Vehicle Code. *Id.* at

1340. The relevant reporting requirement, 67 Pa.Code § 83.5, Other physical and medical standards, (a)(2), mandated notification if the patient suffered from unstable or brittle diabetes, unless there had been a continuous period of at least six months freedom from a related syncopal attack. This Court noted:

[I]t is not the physicians' job to protect all third parties who might come into contact with the affected individual. Clearly, the provisions implicated here do not mention a duty to report the patient's medical deficiency to any specified third party. Rather, the physicians' only responsibility is to evaluate (within the confines of the legislative language) the patient's ability to operate a motor vehicle and to notify *the Department of Transportation* if the patient is unable to drive in a safe manner. Reporting the patient to the proper authorities when necessary is very different from imposing upon a treating physician the duty of protecting the entire public from any harm that might result from his/her patient's actions.

*Id.* at 1343–1344 (citations omitted).

¶ 11 Unlike *Witthoeft* and *Crosby*, the case now subject of our consideration involves a situation where the patient-driver *had a history of prior accidents as a result of the medical condition in question*, and *the reviewing physician was fully aware of this condition prior to the PennDOT evaluation.* As the trial court noted, "[i]n Crosby the culpable driver was a diabetic patient who had never suffered a loss of consciousness previously as a result of his affliction. In Whitthoeft [sic], the driver was a patient with poor vision, but there was no allegation that her vision had ever previously caused her to become involved in an accident." Trial Court Opinion at 5. Here, appellants knew or had reason to know that their patient, Jack Smith, suf-

fered from a seizure disorder and had sustained two prior automobile accidents as a result of his propensity to "black out." Unfortunately for appellees' decedents, however, they failed to provide Smith with adequate treatment for his condition, did not advise him to refrain from driving, and did not properly notify PennDOT that Smith was not physically competent to operate a motor vehicle.

¶ 12 Although not discussed in great detail by the majority, appellants further maintain "the trial court erred in finding that the decedents of the appellees were foreseeable victims when they were struck by a motor vehicle driven by one of the appellant's patients." Appellants' brief at 4, 14.

¶ 13 "In a negligence case, the harm suffered by the plaintiff must be foreseeable to a defendant in light of that defendant's conduct." *R.W. v. Manzek*, 838 A.2d 801, 804 (Pa.Super.2003), *citing Huddleston v. Infertility Center of America, Inc.*, 700 A.2d 453, 457 (Pa.Super.1997) (a duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others). "Duty, in any given situation, is predicated upon the relationship existing between the parties at the relevant time. Where the parties are strangers to each other, such a relationship may be inferred from the general duty imposed on all persons not to place others at risk of harm through their actions." *Roche v. Ugly Duckling Car Sales, Inc.*, 879 A.2d 785, 790 (Pa.Super.2005) (citations omitted).

¶ 14 Our Supreme Court has recognized that care-givers may have a duty to use reasonable diligence in treating their patients so as to prevent harm to innocent members of the public. *See Goryeb v. Com., Dept. of Public Welfare*, 525 Pa. 70, 575 A.2d 545 (1990); *DiMarco supra.*

¶ 15 In *Goryeb*, the Court held that a mental health institution was liable to a third party who was killed by a former patient who was released from treatment even though the facility concluded that the patient posed a "clear and present danger to himself and others" and was "severely mentally disabled." *Goryeb* at 73–76, 575 A.2d at 546–547. The Court's decision to impose liability was supported by sections of the Mental Health Procedures Act, 50 P.S. §§ 7101–7503, specifically addressing when individuals employed by mental health facilities may be liable for the consequences of treatment or discharge decisions. *Id.* at 76–78, 575 A.2d at 548–549.

¶ 16 Similarly, in *DiMarco*, the Supreme Court held that a physician who provided erroneous advice to a patient he knows suffers from hepatitis could be liable to a third party to whom the patient transmits the disease during sexual contact. *DiMarco* at 559–560, 583 A.2d at 423. The Court concluded:

> Thus, the duty of a physician in such circumstances extends to those within the foreseeable orbit of risk of harm. If a third person is in that class of persons whose health is likely to be threatened by the patient, and if erroneous advice is given to that patient to the ultimate detriment of the third person, the third person has a cause of action against the physician, because the physician should recognize that the services rendered to the patient are necessary for the protection of the third person.

*Id.* at 562, 583 A.2d at 424–425 (citation omitted).[2]

---

**2.** While not binding on this Court, I note that a number of jurisdictions have concluded that a physician may owe a duty to third parties whose patient causes them injury. *See Duvall v. Goldin*, 139 Mich.App. 342, 362 N.W.2d 275 (1984) (it is foreseeable that a doctor's

¶ 17 As did the trial judge, I find the facts underlying this case to be more analogous to our Supreme Court's holdings in *Goryeb* and *DiMarco* than *Witthoeft* and *Crosby*. Given his knowledge of Smith's medical condition and history of prior accidents, it was, or should have been, entirely foreseeable to Dr. Hospodar that the failure to properly diagnose Smith and inform PennDOT that he was unfit to drive would create a risk of harm to both Smith and any third parties with whom he shared the road. Appellants clearly breached their duty to do so.

¶ 18 Additionally appellants contend "public policy precludes the finding of a duty of care by a physician to a third party who is not the physician's patient." Appellants' brief at 4, 19. Based on the foregoing discussion and the limited factual scenario under which I have analyzed this case, I disagree. Contrary to appellants' assertion, allowing appellees to maintain a cause of action against appellants in this case would not "open up physicians to lawsuits anytime one of their patients is involved in some type of accident whereby the patient injured a third party." Appellants' brief at 9. As this Court espoused in *Spierling v. First American Home Health Services, Inc.*, 737 A.2d 1250, 1253 (Pa.Super.1999):

> It is only when a given policy is so obviously...against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that the court may constitute itself

the voice of the community in so declaring.

*Id.* at 1253 (citation omitted). The instant matter is clearly not such a case and it is for that reason my conclusions are limited to the specific facts set forth in this matter and, as previously indicated, I would decline to find a duty in every instance involving a physician, his patient and a third party.

¶ 19 I reject appellants' claims of trial court error and dissent to the majority decision reversing the court's Order.

---

failure to diagnose or properly treat an epileptic condition may create a risk of harm to a third party, and whether the proximate cause of the accident was defendant's negligence is a question of fact for the jury); *Burroughs v. Magee,* 118 S.W.3d 323 (Tenn.2003) (a physician who prescribed medication to his patient owed a duty of care to non-patient third party to inform his patient of possible adverse ef-

fects of the medication when the patient caused an automobile accident with the third party); *Harden v. Allstate Ins. Co.,* 883 F.Supp. 963 (D.Del.1995) (a physician owed common-law duty to the public at large to take steps to prevent his patient who suffered from epilepsy from driving, but it remains for the jury to determine whether that the physician has violated that duty.)